**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JOHN D. JEFFERSON,
*Defendant-Appellant.*

No. 08-30067

D.C. No.
3:06-CR-00069-
RRB

OPINION

Appeal from the United States District Court
for the District of Alaska
Ralph R. Beistline, District Judge, Presiding

Submitted January 23, 2009*
Seattle, Washington

Filed May 26, 2009

Before: Robert R. Beezer, Richard C. Tallman and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Beezer

---

*The panel unanimously finds this case suitable for decision without
oral argument. *See* Fed. R. App. P. 34(a)(2).

**COUNSEL**

Louis James Menendez, Menendez Law Office, Juneau, Alaska, and Marcia E. Holland, contract attorney, Juneau, Alaska, for the defendant-appellant.

Daniel R. Cooper, Jr., Assistant United States Attorney, Anchorage, Alaska, for the plaintiff-appellee.

## OPINION

BEEZER, Circuit Judge:

John Jefferson appeals from a final judgment entered in the district court upon his conditional guilty plea to the charge of attempted possession of methamphetamine with intent to distribute. Jefferson challenges the district court's denial of his motion to suppress by arguing that the detainment of his express mail package, which had a contractually guaranteed time of delivery, violated the Fourth Amendment. Jefferson also challenges, as a violation of the Double Jeopardy Clause of the Fifth Amendment, his retrial after the first jury indicated that it was "unable to come to a decision" on the intent to distribute offense but convicted him of the lesser-included offense of attempted possession.

The district court had jurisdiction under 21 U.S.C. §§ 841(b)(1)(A) and 846. We have jurisdiction under 28 U.S.C. § 1291. We affirm.

## I

On the morning of April 6, 2006, an express mail package addressed to John Jefferson arrived at the United States Post Office in Juneau, Alaska. The package was sent from Oregon on April 5 and delivery was guaranteed by 3:00 p.m. on April 7. The postal clerk processing the package telephoned a postal inspector in Anchorage. The inspector had previously instructed clerks to notify him if any packages arrived that were to be delivered to Jefferson's address. The inspector told the clerk to detain the package overnight.

The inspector arrived in Juneau the morning of April 7 along with a law enforcement team and a narcotics-detection canine. The inspector visually inspected the outside of the package and submitted it to a canine sniff. The canine alerted to narcotics. Law enforcement applied for a search warrant,

which the magistrate judge granted at 11:55 a.m. Law enforcement opened the package and discovered 253 grams of methamphetamine. At approximately 1:30 p.m., law enforcement obtained a beeper warrant and placed a beeper inside the package. Around 5:00 p.m., law enforcement made a controlled delivery of the package to Jefferson's address. The beeper soon went off and law enforcement arrested Jefferson.

The government prosecuted Jefferson for attempted possession of methamphetamine with intent to distribute and the lesser-included offense of attempted possession. Jefferson moved the district court to suppress the methamphetamine. The district court denied the suppression motion.

At trial, the district court provided the jury with a verdict form for the intent to distribute offense and a verdict form for the attempted possession offense. The jury instructions provided that "if after all reasonable efforts you are unable to reach a verdict [on the intent to distribute offense], you should record the decision on the verdict form and go on to consider whether defendant is guilty or not of the lesser included offense of Attempted Possession of a Methamphetamine." After deliberating, the jury informed the district court that it had reached a verdict.

The verdict form for the intent to distribute offense originally read, in pertinent part: "We, the Jury . . . do find the Defendant, JOHN D. JEFFERSON, _____ (Guilty or Not Guilty) of the crime of Attempted Possession of a Controlled Substance with Intent to Distribute . . . ." The jury crossed out the word "do" and wrote in "were unable to." The jury also wrote the following on the verdict form: "The jury was unable to come to a decision on this verdict." On the verdict form for the attempted possession offense, the jury found Jefferson "Guilty."

Jefferson requested the district court to order continued deliberations, which the court did after reading the jury a

modified *Allen* charge.[1] After continued deliberations, the jury sent the court a note, which the court read into the record: "We were under the impression that if we were unable to come to a decision on verdict 1, we would record the decision on the verdict form and go (indiscernible) the defendant's guilty or not unless—if we cannot come to a unanimous verdict on 1, are we able to vote yes?" The district court, upon the agreement of Jefferson and the government, answered the jury's question affirmatively.

Upon further deliberations, the jury indicated that it had reached a verdict and again gave the court the interlineated verdict forms. The district court decided "to go ahead and publish the verdict. Nothing has changed." The court polled the jurors as to whether further deliberations might produce a verdict on the intent to distribute offense, all of whom indicated that further deliberations would be unavailing. Neither the government nor Jefferson objected to the district court declaring a mistrial because of the hung jury.

After the court dismissed the jury, the government announced that it would retry Jefferson on the intent to distribute offense. Jefferson moved to dismiss his retrial based on double jeopardy, which the district court summarily denied. Jefferson entered a conditional guilty plea on the intent to distribute offense, preserving for appeal the denial of his suppression motion and double jeopardy motion.

## II

"We review de novo the denial of a motion to suppress." *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc). "Whether the exclusionary rule applies to a given case is reviewed de novo, while the underlying factual findings are reviewed for clear error." *Id.*

---

[1]An "*Allen* charge" is a supplemental instruction typically given to the jury after it indicates that it is having trouble reaching unanimity. *Allen v. United States*, 164 U.S. 492, 501 (1896).

"We review de novo the denial of a motion to dismiss on double jeopardy grounds." *United States v. Bhatia*, 545 F.3d 757, 759 n.1 (9th Cir. 2008).

## III

**[1]** Jefferson argues that the district court erred in denying his suppression motion because the postal inspector's detainment of his package on April 6 violated the Fourth Amendment. The first clause of the Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[2] U.S. Const. amend. IV. "This text protects two types of expectations, one involving 'searches,' the other 'seizures.' A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (footnotes omitted). "It has long been established that an addressee has both a possessory and a privacy interest in a mailed package." *United States v. Hernandez*, 313 F.3d 1206, 1209 (9th Cir. 2002).

**[2]** Our case law expressly forecloses any assertion by Jefferson that his privacy interests in the package were implicated. The postal inspector's visual inspection of the package did not implicate the Fourth Amendment because "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." *United States v. Hoang*, 486 F.3d 1156, 1159 (9th Cir. 2007) (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)). Likewise, the postal inspector's "use of a well-trained narcotics-detection dog . . . [did] not implicate legitimate privacy interests." *Illinois v.*

---

[2]"Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy[.]" *United States v. Jacobsen*, 466 U.S. 109, 114 (1984).

*Caballes*, 543 U.S. 405, 409 (2005); *see also Hoang*, 486 F.3d at 1160.

**[3]** Because Jefferson's privacy interests were not implicated, "the only constitutional interest potentially implicated is [his] possessory interest in the package." *See Hoang*, 486 F.3d at 1160. "We have characterized the possessory interest in a mailed package as being solely in the package's timely delivery." *Id.* (citing *United States v. England*, 971 F.2d 419, 420-21 (9th Cir. 1992)). "In other words, an addressee's possessory interest is in the timely delivery of a package, not in having his package routed on a particular conveyor belt, sorted in a particular area, or stored in any particular sorting bin for a particular amount of time." *Id.* (citation and internal quotation marks omitted).

**[4]** Jefferson argues that his possessory interest in "timely" delivery arose on April 6, "[a]t the time the package was removed from the mail stream and not delivered in the normal fashion along with the other Express Mail packages." In *United States v. Hoang*, we explicitly left unanswered whether a contractually guaranteed delivery time affects the Fourth Amendment possessory interest of a package's sender or recipient. *See id.* at 1162 n.5 ("We observe that the terms of service in the contract between the sender and FedEx may also alter the expectations of the sender or the recipient and may very well affect a subsequent court's analysis of the propriety of any FedEx-approved inspection and diversion of packages.").[3] The United States Court of Appeals for the First Circuit answered this question almost twenty years ago in *United States v. LaFrance*, 879 F.2d 1 (1st Cir. 1989).

In *LaFrance*, per the instructions of law enforcement, a Federal Express employee alerted law enforcement that a package had arrived addressed to LaFrance. *Id.* at 2-3. The

---

[3]In this case, we observe no Fourth Amendment distinction between public and private package carriers.

package had arrived in the morning and delivery was guaranteed by 12:00 p.m. that day. *Id.* at 3. Law enforcement directed the employee to deliver the package to the police department instead of LaFrance. *Id.* The package arrived at the police department around 12:45 p.m., hence 45 minutes after the guaranteed delivery time. *Id.* At about 1:15 p.m., the package was subjected to a narcotics-detection canine sniff and the canine alerted to contraband. *Id.* LaFrance presented essentially the same arguments for suppression as those Jefferson now advances.

The First Circuit observed that "a possessory interest derives from rights in property delineated by the parameters of law, in this case, contract law." *Id.* at 7; *see also Rakas v. Illinois*, 439 U.S. 128, 143 n.12 ("Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."). The First Circuit noted the hornbook contract law principle "that where a delivery time is agreed upon, a court should not intrude to imply a (different) reasonable time for delivery." *LaFrance*, 879 F.2d at 7.

The First Circuit held that "the only possessory interest at stake before Thursday noon was the contract-based expectancy that the package would be delivered to the designated address by morning's end. FedEx obligated itself to no more than that." *Id.* In addressing the time period "[f]rom noon until 2:15 p.m.," during which time LaFrance had a possessory interest in the package but law enforcement had yet to establish probable cause, the First Circuit concluded that the detention was reasonable based on the circumstances. *Id.* at 10; *see also Hoang*, 486 F.3d at 1159 ("Once a search or seizure that implicates the Fourth Amendment has occurred, the reasonableness of that act must be determined by weighing the public interest against the protected private interest.").

**[5]** The reasoning of *LaFrance* is convincing. We hold that an addressee has no Fourth Amendment possessory interest in

a package that has a guaranteed delivery time until such delivery time has passed. Before the guaranteed delivery time, law enforcement may detain such a package for inspection purposes without any Fourth Amendment curtailment. *See United States v. Gill*, 280 F.3d 923, 932-33 (9th Cir. 2002) (Gould, J., concurring) ("Investigators may inspect mail as they wish without any Fourth Amendment curtailment, so long as the inspection does not amount to a 'search,' and so long as it is conducted quickly enough so that it does not become a seizure by significantly delaying the date of delivery."). Once the guaranteed delivery time passes, however, law enforcement must have a "reasonable and articulable suspicion" that the package contains contraband or evidence of illegal activity for further detainment. *See Hoang*, 486 F.3d at 1160.

**[6]** In this case, the post office guaranteed that Jefferson would receive his package by 3:00 p.m. on April 7. Any expectation that Jefferson or the post office may have had that the package could arrive earlier is irrelevant. *See LaFrance*, 879 F.2d at 7. The postal inspector did not need any suspicion to detain Jefferson's package overnight on April 6 because Jefferson did not yet have a possessory interest in the package. By the time "the constitutional chemistry was altered" at 3:00 p.m. on April 7, *see id.*, law enforcement had already established probable cause to seize Jefferson's package. *See Hoang*, 486 F.3d at 1160 n.1. Thus, law enforcement acted well within the bounds of the Fourth Amendment in detaining, seizing and then searching Jefferson's package.

**[7]** In sum, we hold that a package addressee does not have a Fourth Amendment possessory interest in a package that has a guaranteed delivery time until the guaranteed delivery time has passed. Jefferson had no Fourth Amendment possessory interest in the "timely" delivery of his package until 3:00 p.m. on April 7. We need not weigh the public interest in the package's detainment against the protected private interest because probable cause was established before Jefferson gained a possessory interest in the package. *See id.* at 1159.

We affirm the district court's denial of Jefferson's suppression motion.

**IV**

Jefferson argues that permitting his retrial violated the Double Jeopardy Clause of the Fifth Amendment. The Double Jeopardy Clause guarantees that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Double Jeopardy Clause is not an absolute bar to successive trials. *Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 308 (1984).

[8] Jefferson first argues that the first jury impliedly acquitted him. "The Fifth Amendment's Double Jeopardy Clause prohibits retrial after an acquittal, whether express or implied by jury silence." *Brazzel v. Washington*, 491 F.3d 976, 981 (9th Cir. 2007) (citing *Green v. United States*, 355 U.S. 184, 191 (1957)). "An implied acquittal occurs when a jury returns a guilty verdict as to a lesser included or lesser alternate charge, but remains silent as to other charges, without announcing any signs of hopeless deadlock." *Id.*

[9] The first jury did not impliedly acquit Jefferson because it was not "silent" on the issue of Jefferson's intent to distribute. Rather, the first jury indicated that it was hopelessly deadlocked on that offense. On the interlineated verdict form for the intent to distribute offense, the jury indicated that it was "unable to" find Jefferson guilty or not guilty. To make their position abundantly clear, the jury also wrote that it was "unable to come to a decision on this verdict." Each juror confirmed the hopeless deadlock when polled by the district court. The jury was anything but "silent" in this case; in fact, it was almost as "loud" as a jury can be.

[10] Jefferson next argues that the Double Jeopardy Clause prohibits his retrial because "manifest necessity" did not exist for the district court to declare a mistrial. "In contrast to an

implied acquittal, retrial is permitted where there is a mistrial declared due to the 'manifest necessity' presented by a hung jury." *Id.* at 982 (citing *United States v. Perez*, 22 U.S. 579, 580 (1824)). "A hung jury occurs when there is an irreconcilable disagreement among the jury members." *Id.* The record should reflect that the jury is "genuinely deadlocked." *Richardson v. United States*, 468 U.S. 317, 324 (1984). "The trial judge's decision to declare a mistrial when he considers the jury deadlocked is therefore accorded great deference by a reviewing court." *Arizona v. Washington*, 434 U.S. 497, 510 (1978).

**[11]** In this case, as shown above, the jury repeatedly indicated that it was genuinely deadlocked. When the jury first returned the interlineated verdict forms, the jury told the district court that it had reached a verdict. Instead of accepting the jury's verdict on the attempted possession offense and deadlock on the intent to distribute offense, the district court, upon the request of Jefferson, ordered continued deliberations. The district court also read the jury a modified *Allen* charge. In the midst of the jury's continued deliberations, the jury sent a note which sought to confirm the jury's "impression that if we were unable to come to a decision on verdict 1, we would record the decision on the verdict form." The district court confirmed the jury's understanding that it could find Jefferson guilty on the attempted possession offense without finding him guilty, or not guilty, on the intent to distribute offense. As such, the jury soon returned the same interlineated verdict forms to the district court.

**[12]** There can be no serious dispute as to whether the jury was genuinely deadlocked because the jury notified the district court as such on several occasions. A district court need not, and indeed should not, order continued deliberations once it becomes apparent that hopeless deadlock exists. The district court appropriately exercised its discretion in declaring a mistrial based on the manifest necessity that confronted it.

We affirm the district court's denial of Jefferson's double jeopardy motion.

**V**

The district court correctly denied Jefferson's motion to suppress and motion to dismiss based on double jeopardy.

**AFFIRMED.**