# ILLINOIS OFFICIAL REPORTS

***People v. Tyus*, 2011 IL App (4th) 100168**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RYAN TYUS, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-10-0168 |
| Filed | October 28, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for controlled substance trafficking and criminal drug conspiracy were upheld over his contentions that the trial court erred in denying his motion to suppress based on the detention of a package, that his counsel was ineffective in failing to move to suppress evidence seized from his truck following his arrest, and that his 25-year sentence was erroneous, since the police had a legitimate basis to detain the package beyond the scheduled delivery time, the police were acting in reasonable reliance on the law in effect at the time of defendant's arrest when the search of his truck was substantially contemporaneous with his arrest, and defendant forfeited his argument against his sentence by failing to file a postsentence motion challenging the sentence. |
| Decision Under Review | Appeal from the Circuit Court of Macon County, No. 07-CF-1144; the Hon. Katherine M. McCarthy, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Karen Munoz, and Colleen Morgan, all of State Appellate Defender's Office, of Springfield, for appellant.

Jack Ahola, State's Attorney, of Decatur (Patrick Delfino, Robert J. Biderman, and Aimee Sipes Johnson, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.

Justices McCullough and Cook concurred in the judgment and opinion.

**OPINION**

¶ 1    In August 2007, Decatur police detained a package being shipped by United Parcel Service (UPS)–a private corporation–that displayed several characteristics consistent with packages used to transport narcotics. The police brought the package from the UPS facility to police headquarters for further investigation. After obtaining a search warrant, the police discovered cocaine inside the package. Following a controlled delivery of the package at its destination, defendant, Ryan Tyus, was arrested.

¶ 2    That same month, the State charged defendant with (1) controlled substance trafficking with a prior delivery-of-controlled-substance conviction (100 or more but less than 400 grams of a substance containing cocaine) (720 ILCS 570/401.1 (West 2006)) and (2) criminal drug conspiracy with a prior delivery-of-controlled-substance conviction (100 or more but less than 400 grams of a substance containing cocaine) (720 ILCS 570/405.1 (West 2006)).

¶ 3    Following an August 2009 trial, a jury convicted defendant of both charges. Shortly thereafter, the trial court sentenced him to 25 years in prison.

¶ 4    Defendant appeals, arguing that (1) the trial court erred by denying his motion to suppress evidence obtained as a result of the detention of the package; (2) he received ineffective assistance of trial counsel, in that his counsel failed to file a motion to suppress evidence obtained from defendant's truck following his arrest; and (3) the court erred by imposing a 25-year sentence. We disagree and affirm.

¶ 5                                    I. BACKGROUND

¶ 6                    A. Events Prior to the Issuance of the Search Warrant

¶ 7    At the March 2009 hearing on defendant's motion to suppress, Detective Steve Young and Sergeant Randy Sikowski of the Decatur police department, who were the only witnesses called at that hearing, testified as follows.

¶ 8    In the early morning hours of August 10, 2007, an officer with the Louisville Metropolitan police department was on "package-interdiction" duty at the UPS facility located within the Louisville, Kentucky, airport. That officer noticed a package that displayed several characteristics consistent with packages used to transport narcotics and then contacted Carl Batters, a retired Chicago police officer and specialist in the detection and interdiction of suspicious packages.

¶ 9    Shortly thereafter, Batters relayed to Young the following description of the package, as described to Batters by the Louisville officer: (1) the shipping label on the package listed the sender as Pamela Switerland of 1612 Wilshire, Los Angeles, California, and the recipient as Ranae Burton of 656 S. Fairview, Decatur, Illinois; (2) the package measured 20 x 20 x 12 inches; (3) the package was marked for "Next-Day-Air, Early-A.M." delivery; and (4) the package was heavily taped around all edges and seams. Batters also told Young that the Louisville officer had dialed the telephone number listed on the shipping label for Ranae Burton, but the call was received by a man who did not live at the destination address or know anyone named Ranae Burton.

¶ 10    Batters informed Young that based on the experience and expertise of Batters in the field of package interdiction, those factors suggested that the package contained illicit narcotics. Batters explained to Young that (1) Los Angeles is a known "source city" for narcotics and Decatur is a known "user city" and (2) narcotics traffickers often attempt to avoid detection by (a) shipping narcotics using overnight, early morning delivery and (b) sealing all edges and seams of packages with tape to prevent odors from escaping.

¶ 11    After speaking with Batters, Young called Sikowski, who was in charge of the Decatur police department's narcotics unit, and told him about the package. Sikowski and Young then traveled together to the UPS office located within the Decatur airport and waited for the package to arrive.

¶ 12    On his way to the UPS office, Sikowski telephoned a fellow officer and asked him to conduct a computer-aided dispatch (CAD) search for "Ranae Burton." The officer's search returned no results, which meant that the Decatur police department had never encountered a person named Ranae Burton. Young and Sikowski arrived at the UPS office around 5 a.m. When the package arrived at approximately 5:10 a.m., UPS employee Chris Wright removed the package from the plane and gave it to Young, who inspected the exterior of the package and confirmed the physical features that Batters had described.

¶ 13    Shortly after Wright gave the package to Young, a police canine unit arrived at the UPS office to conduct a canine sniff of the package. Sergeant Dan Weise deployed his dog on the package, which was placed alongside three other random packages, several feet apart. The dog did not alert to any of the packages. Weise informed Young that the dog was not trained to detect ecstasy, a drug for which Los Angeles is a known source city. At 5:40 a.m., Young transported the package to police headquarters for further investigation.

¶ 14    At headquarters, Young and Sikowski attempted to verify whether the names on the package were fictitious by focusing on the apparent recipient, Ranae Burton of 656 S. Fairview, Decatur, Illinois. Young and Sikowski both conducted unsuccessful searches for "Ranae Burton" in the CAD database, which meant that no one named Ranae Burton had

ever made contact with the Decatur police department as the complainant of a crime, the victim of a crime, the suspect of a crime, or the witness to a crime.

¶ 15      Young also checked the Secretary of State's "Soundex" database, which provides information on all persons in Illinois who have registered a vehicle with the State or who have been issued state identification cards or driver's licenses. The Soundex search yielded no results for "Ranae Burton."

¶ 16      Young then checked the Illinois Law Enforcement Agencies Data System (LEADS), which provides, in pertinent part, information on all persons in Illinois who are on parole or who have outstanding arrest warrants. The LEADS search yielded no results for "Ranae Burton."

¶ 17      Finally, Young checked the water billing records for the destination address of the package (656 S. Fairview) and learned that the water account was registered under the name Trevell Tyus. The billing records also revealed that the water had been shut off at that location 21 days earlier. Young checked a police database to determine whether Ranae Burton was a "known associate" of Trevell Tyus, but the check revealed no such information.

¶ 18      Young and Sikowski next turned their investigation to the apparent sender of the package, Pamela Switerland of 1612 Wilshire, Los Angeles, California. Young dialed the telephone number listed on the shipping label, but that number led him to an automated message that revealed that the number was not in service.

¶ 19      Sikowski telephoned the Los Angeles police department and learned from a dispatcher there that the 1600 block of Wilshire was actually in the city of Santa Monica, although the zip code listed on the shipping label corresponded to Los Angeles. Sikowski called the Santa Monica police department and spoke with a dispatcher who indicated that the Santa Monica police department had never made contact with that address. That dispatcher also suggested that the address was likely fictitious, although Sikowski did not independently verify that information.

¶ 20      Following the investigation at police headquarters into the names listed on the package, Young, with the assistance of an assistant State's Attorney, began preparing a complaint for search warrant for the package. As Young was preparing that complaint, Sikowski took the package to the security area of the Macon County courthouse and passed it through the X-ray machine. The X ray revealed a 4- to 6-inch, tightly wrapped, cylindrical object suspended in the middle of the package. Sikowski brought the package back to Young at police headquarters and described to him what the X ray revealed. Young included that information, as well as the information he learned regarding the names on the package, in the complaint for search warrant. After returning the package to Young at police headquarters, Sikowski drove directly to 656 S. Fairview, the destination address of the package, to set up surveillance. Sikowski arrived at approximately 8:15 a.m., drove past the house and, having failed to observe any vehicles or activity in the immediate area, pulled into a position to watch the house. Immediately upon establishing surveillance, Sikowski observed defendant walk up the sidewalk and to the front door of the house. Defendant used a key to open the door and went inside. Sikowski remained in position and–one hour and five minutes later, at 9:20 a.m.–observed defendant exit the house through the front door. Defendant locked the

front door and fixed a piece of white paper to the front screen door. Defendant then got into a black Dodge pickup truck and drove away. Sikowski waited a short period of time and then went to the front door to look at the piece of paper, which read as follows: "ATT. I HAD TO LEAVE FOR WORK. JUST LEAVE THE PACKAGE ON PORCH. THANK YOU[,] RANAE." Sikowski placed the note back in the door and returned to his vehicle to continue surveillance.

¶ 21                         B. The Complaint for Search Warrant

¶ 22        Shortly before 9:25 a.m., Young completed the complaint for search warrant, which he and an assistant State's Attorney submitted to Judge Lisa Holder White for approval. That complaint described the following background leading up to that request for search warrant: (1) Young's experience as a narcotics officer; (2) Batters' experience and expertise in package interdiction, provided to Young by Batters; (3) information about the suspicious features of the package described to Batters by the Louisville officer, which Batters relayed to Young; (4) Young's confirmation at the UPS office of the description of the package provided by Batters; (5) information provided by UPS personnel to Young regarding the timing of the movements of the package from Los Angeles to Louisville and on to Decatur; (6) the physical features of the package, including dimensions, weight, heavy taping, and information from the shipping labels; (7) Young's belief, based on past training and experience, that the origin and timing of the shipment indicated drug activity; (8) the negative canine sniff and the fact that the dog was not trained to detect ecstacy; (9) the check of the water billing records, which revealed that the water service, registered to "Terrell [*sic*]" Tyus, had been shut off 21 days earlier; (10) that neither telephone number listed on the package corresponded to the person listed, including the fact that the number listed for Ranae Burton connected with a man who (a) did not know anyone named Ranae Burton and (b) had had that telephone number for four years; (11) the inconsistencies with the California address and the information provided by the Los Angeles and Santa Monica police departments; (12) the characteristics of the contents of the package, as gleaned from the X-ray image; (13) Young's knowledge, based on past training and experience, that narcotics traffickers often use false names and addresses; and (14) Young's overall belief, based on the aforementioned information, that the package contained narcotics. Young also presented the package to Judge Holder White for her inspection. Based upon the foregoing, the judge issued the search warrant.

¶ 23                     C. "Next-Day-Air, Early-A.M." Delivery and
                  the Authorization and Execution of the Search Warrant

¶ 24        At the hearing on defendant's motion to suppress, Young provided the only testimony related to the "Next-Day-Air, Early-A.M." delivery, explaining that "Next-Day-Air, Early-A.M." delivery means that the package is "to be delivered by 8:30 a.m.," as follows:

        "[PROSECUTOR]: Now, you mentioned some of the factors that were suspicious to you, the early morning, early a.m. delivery, how does that lend [suspicion] to this containing some type of contraband?

-5-

[YOUNG]: Like I said, not only is it next day, but it's next day air marked for early a.m. delivery, which indicated that package is to be delivered by 8:30 a.m. People will often try to conduct drug transactions or illegal activity at those early morning hours in the hopes that narcotic officers or other officers will not be on the streets or will not be fully, you know, staffed at those time[s] of day so hopefully they can operate without being detected by us.

[PROSECUTOR]: Now, the next day air that's a delivery time of 10:30?

[YOUNG]: Yes. A normal next day air is 10:30. If you choose to have next day air with early a.m. delivery then you are going to receive that package by 8:30 a.m."

¶ 25 According to the search warrant and Young's testimony at the hearing on defendant's motion to suppress, at 9:25 a.m.–55 minutes after the package was due to arrive, based upon Young's testimony that the package was to be delivered by 8:30 a.m.–Judge Holder White authorized, and Young thereafter executed, the search warrant on the package. In addition to the authorization to search, the warrant also authorized the police to seize the package and all other evidence related to possessing or trafficking a controlled substance. Inside the sealed package, Young found two vacuum-sealed bags of cocaine that had been wrapped in plastic wrap, lathered in axle grease, wrapped in a comforter, sealed inside of the plastic comforter bag, and surrounded with foam packing peanuts. Young removed the cocaine, but otherwise restored the package to its original outward appearance.

¶ 26                 D. The Events Following the Execution of the Search Warrant

¶ 27 After executing the search warrant on the package, Young called Sikowski, who was still in position monitoring the house at 656 S. Fairview, and informed Sikowski that he had located cocaine inside of the package. At that point, Sikowski removed the note from the door to preserve it as evidence.

¶ 28 Sikowski returned to police headquarters and used the Soundex database to search for registration records for black Dodge pickup trucks similar to the one that he observed defendant get into at 656 S. Fairview. His search revealed that defendant had registered a 2003 black Dodge truck bearing the registration number 8016P-B. Based on defendant's driver's license image contained in the Soundex database, Sikowski recognized defendant as the man whom he had seen place the note in the door of 656 S. Fairview earlier that morning. Sikowski then searched the CAD database and learned that defendant was a "known associate" of Trevell Tyus, the holder of the water service account for 656 S. Fairview.

¶ 29 At 11:30 a.m., master sergeant Shad Edwards of the Illinois State Police, posing as a UPS employee, placed the package on the front porch of 656 S. Fairview. Several different officers then set up surveillance at that residence.

¶ 30 At approximately 1:50 p.m., Detective David Dailey, who was in an unmarked car, observed a silver Chevy HHR pass in front of 656 S. Fairview five times. On the fifth pass, the driver pulled the Chevy into the driveway. Dailey used his police radio to inform the other officers in the area that the Chevy was in the driveway. At that point, Detective Chad Ramey, who had been positioned south of the house, observed defendant in his black Dodge

pickup truck driving south on Fairview. Ramey used his police radio to inform other officers in the area that the Dodge truck was headed south on Fairview. Young was positioned in a marked squad car several blocks south of the house on Lincoln Park Drive, just off Fairview, when he learned that the truck was headed south on Fairview. The driver turned the black Dodge truck onto Lincoln Park Drive and drove past Young. Young, already having observed defendant's driver's license photo and vehicle registration information at headquarters, saw that (1) the truck's license plate number was 8016P-B and (2) the truck was being driven by defendant. Young followed defendant for several blocks before conducting a traffic stop and taking defendant into custody.

¶ 31　　Shortly thereafter, Sikowski arrived on the scene of that traffic stop and confirmed that defendant was the man who had placed the note on the door earlier that day. The police searched defendant's truck incident to defendant's arrest and seized evidence that was used to obtain search warrants for two self-storage units and two houses associated with defendant. The State later used evidence seized from the truck and the other locations against defendant at trial.

¶ 32　　　　　　　　　　　　　E. The State's Charges

¶ 33　　In August 2007, the State charged defendant with (1) controlled substance trafficking with a prior delivery-of-controlled-substance conviction (100 or more but less than 400 grams of a substance containing cocaine) (720 ILCS 570/401.1 (West 2006)) and (2) criminal drug conspiracy with a prior delivery-of-controlled-substance conviction (100 or more but less than 400 grams of a substance containing cocaine) (720 ILCS 570/405.1 (West 2006)).

¶ 34　　　　　　　　　　　F. Defendant's Motion To Suppress

¶ 35　　In November 2008, defendant moved to suppress the evidence obtained from the detention and subsequent search of the package. In his motion, defendant argued that (1) the police lacked reasonable suspicion to detain the package and (2) the search warrant was not supported by probable cause.

¶ 36　　In asserting that no reasonable suspicion existed to detain the package, defendant argued, in pertinent part, as follows:

"[T]he only thing that Detective Young was able to articulate as suspicious about the [p]ackage is that it was in a brown cardboard box, which was apparently specifically designed for parcels since the dimensions were written on it, and it was taped shut. In other words, the [p]ackage looked exactly like what one thinks of as the typical parcel package. This is not suspicious. There was nothing about the package that would give any indication at all about its contents or that the contents were somehow illegal. Cf. *United States v. Allman*, 336 F.3d 555 (7th Cir. 2003) (fact that part of machine gun was protruding from package created probable cause)[.] Therefore Detective Young's seizure of the [p]ackage to submit it to a drug dog sniff was illegal because it was not supported by any reasonable suspicion that it contained narcotics.

While there was no basis for the drug dog sniff, once the drug dog failed to alert on

the package any suspicion that may have existed was completely dispelled and no further basis existed for the seizure or search of the [p]ackage."

¶ 37 The trial court denied defendant's motion, finding, in pertinent part, as follows: (1) the facts available to the police were sufficient to establish reasonable, articulable suspicion that the package contained narcotics, given that (a) the failure of the dog to alert on the package left open the reasonable possibility that the package contained ecstasy and (b) the relatively brief continued detention of the package for further investigation allowed the police to confirm facts previously related to them by Batters, as well as additional information that made it highly likely that the sender and recipient listed on the package were fictitious and that no one was living at the destination address; (2) probable cause existed to issue the warrant; (3) the warrant was issued less than one hour after the package was due to arrive at its destination (8:30 a.m. delivery); and (4) the continued detention was reasonable under the circumstances.

¶ 38                                   G. Defendant's Trial and Sentence

¶ 39 Following defendant's August 2009 trial, the jury convicted him of (1) controlled substance trafficking and (2) unlawful criminal drug conspiracy. The trial court later sentenced defendant to 25 years in prison for controlled substance trafficking. (The court did not sentence him for unlawful drug conspiracy.)

¶ 40 This appeal followed.

¶ 41                                            II. ANALYSIS

¶ 42 Defendant argues that (1) the trial court erred by denying his motion to suppress evidence obtained as a result of the detention of the package; (2) he received ineffective assistance of trial counsel, in that his counsel failed to file a motion to suppress evidence seized from defendant's truck following his arrest; and (3) the trial court erred by imposing a 25-year sentence. We address defendant's contentions in turn.

¶ 43         A. Defendant's Claim That the Trial Court Erred by Denying His Motion To

                Suppress Evidence Obtained as a Result of the Seizure of the Package

¶ 44 Defendant first contends that the trial court erred by denying his motion to suppress evidence obtained as a result of the detention of the package. Specifically, defendant asserts that the police violated his fourth-amendment right to be free from warrantless seizures when the police, having no reasonable suspicion, "excessively detained" his package. For the reasons that follow, we disagree.

¶ 45                                      1. *The Standard of Review*

¶ 46 "This court applies a two-part standard of review when reviewing a ruling on a motion to suppress." *People v. Seiler*, 406 Ill. App. 3d 352, 356, 943 N.E.2d 708, 712 (2010). We will reject a trial court's factual findings only if they are against the manifest weight of the

-8-

evidence. *People v. Johnson*, 237 Ill. 2d 81, 88, 927 N.E.2d 1179, 1184 (2010). However, we review *de novo* the court's ultimate ruling. *Johnson*, 237 Ill. 2d at 88-89, 927 N.E.2d at 1184.

¶ 47             2. *Protectible Interests Under the Fourth Amendment*

¶ 48      In *United States v. Jefferson*, 566 F.3d 928 (9th Cir. 2009), the court discussed protectible interests under the fourth amendment in a factual context very similar to the case before us. The *Jefferson* court wrote the following:

> "The first clause of the Fourth Amendment safeguards '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' U.S. Const. amend. IV. 'This text protects two types of expectations, one involving "searches," the other "seizures." A "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A "seizure" of property occurs when there is some meaningful interference with an individual's possessory interests in that property.' *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984) (footnotes omitted.)" *Jefferson*, 566 F.3d at 933.

¶ 49                       a. The Facts in *Jefferson*

¶ 50      In *Jefferson*, an express mail package addressed to John Jefferson arrived at the United States Post Office in Juneau, Alaska, on the morning of April 6, 2006. It had been sent from Oregon on April 5, and delivery was guaranteed by 3 p.m. on April 7. *Jefferson*, 566 F.3d at 931. The postal clerk processing the package telephoned a postal inspector in Anchorage, who had previously instructed clerks to notify him if any packages arrived that were to be delivered to Jefferson's address. The inspector told the clerk to detain the package overnight. *Jefferson*, 566 F.3d at 931. The inspector arrived in Juneau the morning of April 7 along with a law-enforcement team and a narcotics-detection canine. The inspector visually inspected the outside of the package and submitted it to a canine sniff. The canine alerted to narcotics. Law enforcement applied for a search warrant, which the magistrate judge granted at 11:55 a.m. *Jefferson*, 566 F.3d at 932. Law enforcement officers opened the package, discovered methamphetamine, and later delivered the package to Jefferson's address after first placing a beeper inside it. *Jefferson*, 566 F.3d at 932. Jefferson was charged with various crimes relating to the methamphetamine found in the package and moved to suppress that evidence. The trial court denied the motion, and a jury convicted him. Jefferson appealed, arguing that the trial court erred by denying his motion to suppress evidence.

¶ 51              b. Privacy Interests Versus Possessory Interests

¶ 52      When considering the defendant's claims in *Jefferson* that the trial court erred by denying his motion to suppress, the court of appeals adopted an analysis that we find sound and applicable to the case before us. That analysis differentiates between a person's privacy interests and a person's possessory interests. To that end, the court in *Jefferson* explained as follows:

> "Our case law expressly forecloses any assertion by Jefferson that his privacy

interests in the package were implicated. The postal inspector's visual inspection of the package did not implicate the Fourth Amendment because '[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection.' *United States v. Hoang*, 486 F.3d 1156, 1159 (9th Cir. 2007) (quoting *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, [511,] 19 L. Ed. 2d 576[, 582] (1967)). Likewise, the postal inspector's 'use of a well-trained narcotics-detection dog . . . [did] not implicate legitimate privacy interests.' *Illinois v. Caballes*, 543 U.S. 405, 409, 125 S. Ct. 834, [838,] 160 L. Ed. 2d 842 [, 847] (2005); see also *Hoang*, 486 F.3d at 1160.

Because Jefferson's privacy interests were not implicated, 'the only constitutional interest potentially implicated is [his] possessory interest in the package.' See *Hoang*, 485 F.3d at 1160. 'We have characterized the possessory interest in a mailed package as being solely in the package's timely delivery.' *Id.* (citing *United States v. England*, 971 F.2d 419, 420-21 (9th Cir. 1992)). 'In other words, an addressee's possessory interest is in the timely delivery of a package, not in having his package routed on a particular conveyor belt, sorted in a particular area, or stored in any particular sorting bin for a particular amount of time.' *Id.* (citation and internal quotation marks omitted)." *Jefferson*, 566 F.3d at 933.

¶ 53    The defendant in *Jefferson* also argued that his possessory interest in timely delivery arose on April 6 when " 'the package was removed from the mail stream and not delivered in the normal fashion along with the other Express Mail packages.' " *Jefferson*, 566 F.3d at 934. The *Jefferson* court rejected this contention and, in doing so, cited approvingly *United States v. LaFrance*, 879 F.2d 1 (1st Cir. 1989).

¶ 54    In *LaFrance*, per police instructions, a Federal Express employee alerted law enforcement that a package had arrived in the morning addressed to LaFrance and delivery was guaranteed by noon that day. Law enforcement directed the employee to deliver the package to the police department instead of LaFrance, and it arrived there around 12:45 p.m. At about 1:15 p.m., the package was subjected to a narcotics-detection canine sniff, and the canine alerted to contraband. *Jefferson*, 566 F.3d at 934. Discussing *LaFrance* further, the *Jefferson* court wrote the following:

"The First Circuit observed that 'a possessory interest derives from rights in property delineated by the parameters of law, in this case, contract law.' *Id.* at 7; see also *Rakas v. Illinois*, 439 U.S. 128, 143 n.12, 99 S. Ct. 421, [430-31 n.12,] 58 L. Ed. 2d 387, [401-02 n.12] ('Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'). The First Circuit noted the hornbook contract law principle 'that where a delivery time is agreed upon, a court should not intrude to imply a (different) reasonable time for delivery.' *LaFrance*, 879 F.2d at 7.

The First Circuit held that 'the only possessory interest at stake before Thursday noon was the contract-based expectancy that the package would be delivered to the designated address by morning's end. FedEx obligated itself to no more than that.' *Id.* ***

The reasoning of *LaFrance* is convincing. We hold that an addressee has no Fourth

Amendment possessory interest in a package that has a guaranteed delivery time until such delivery time has passed. Before the guaranteed delivery time, law enforcement may detain such a package for inspection purposes without any Fourth Amendment curtailment. ***

In this case, the post office guaranteed that Jefferson would receive his package by 3:00 p.m. on April 7. Any expectation that Jefferson or the post office may have had that the package could arrive earlier is irrelevant. See *LaFrance*, 879 F.2d at 7. The postal inspector did not need any suspicion to detain Jefferson's package overnight on April 6 because Jefferson did not yet have a possessory interest in the package. By the time 'the constitutional chemistry was altered' at 3:00 p.m. on April 7, *see id.*, law enforcement had already established probable cause to seize Jefferson's package. *See Hoang*, 486 F.3d at 1160 n.1. Thus, law enforcement acted well within the bounds of the Fourth Amendment in detaining, seizing[,] and then searching Jefferson's package.

*In sum, we hold that a package addressee does not have a Fourth Amendment possessory interest in a package that has a guaranteed delivery time until the guaranteed delivery time has passed*. Jefferson had no Fourth Amendment possessory interest in the 'timely' delivery of his package until 3:00 p.m. on April 7." (Emphasis added.) *Jefferson*, 566 F.3d at 934-35.

¶ 55 Just as the *Jefferson* court found the reasoning of *LaFrance* convincing, we find the reasoning of *Jefferson* convincing, and we will apply it to the present case. In so concluding, we also agree with the special concurring opinion of Chief Judge Hansen in *United States v. Demoss*, 279 F.3d 632, 639-40 (8th Cir. 2002) (Hansen, C.J., specially concurring), in which (in a case again very similar to the present one) he wrote the following:

"Demoss could have had no reasonable expectation that his parcel would not have been handled by other persons and that its exterior would not have been exposed to others for viewing. [Citation.] *** Demoss had no possessory interest in having his package routed on a particular conveyor belt, sorted in a particular area, or stored in any particular sorting bin for a particular amount of time. His only possessory interest in the package was timely delivery ***. ***

*** [A] piece of luggage or mail delivered to a common carrier is not 'seized' within the meaning of the Fourth Amendment until the authorities have interfered with a possessory interest in the luggage or mail such that the expectation of timely delivery of the package or luggage has been frustrated."

¶ 56                       3. *The Time of Delivery in This Case*

¶ 57 As earlier noted, Detective Young provided the only testimony regarding the guaranteed delivery time of the package in this case. He testified that the package was "marked for early a.m. delivery, which indicated that [the] package is to be delivered by 8:30 a.m."

¶ 58                       4. *Defendant's Possessory Interest in This Case*

¶ 59 Following the analysis in *Jefferson*, we conclude that defendant had no possessory

interest in the package prior to 8:30 a.m. on August 11, 2007, which was the "Next-Day-Air, Early-A.M." delivery for the package. Because we agree with *Jefferson* that a package addressee–here, defendant–does not have a fourth-amendment possessory interest in a package that has a guaranteed delivery time until the guaranteed time has passed, defendant had no fourth- amendment possessory interest in the "timely delivery" of his package until 8:30 a.m. on August 11, 2007. *Jefferson*, 566 F.3d at 935.

¶ 60                              5. *The Police Detention of the Package*
                                  *Beyond Its Scheduled Delivery Time*

¶ 61        The record shows that the complaint for search warrant was presented to the judge and she issued the search warrant at 9:25 a.m. on August 11, 2007. Given that the package was scheduled for delivery at 8:30 a.m. that morning, the police detained that package for 55 minutes, keeping it from its normal scheduled delivery. As we earlier explained, defendant did have a fourth-amendment possessory interest in that package during those 55 minutes. That means that the police needed to justify their investigative detention of the package during that 55-minute time period by pointing to specific, articulable facts, and reasonable inferences derived therefrom, that create a reasonable suspicion that a crime was being committed. See *People v. Shapiro*, 177 Ill. 2d 519, 526-27, 687 N.E.2d 65, 69 (1997), where the Supreme Court of Illinois, in a case dealing with the police detention of mail for further investigation, wrote the following:

> "The rationale for allowing the detention and investigation of mail absent probable cause is found in *Terry v. Ohio*, 392 U.S. [1,] 21, 20 L. Ed. 2d [889,] 906, 88 S. Ct. [1868,] 1880 (1968), and its progeny, which interpret the fourth amendment as permitting minimally intrusive investigatory stops of individuals and/or their property where there is a reasonable suspicion of criminal activity. *** Reasonable suspicion arises where specific and articulable facts, and rational inferences therefrom, reasonably justify an intrusion."

Accordingly, we will examine this record to see if it supports such a finding.

¶ 62        Before doing so, we emphasize that the time of the police detention of the package is limited to the 55-minute period between 8:30 and 9:25 a.m. That is because once the judge issued the search warrant at 9:25 a.m., the police detention ended, and the police then possessed judicial authority to open the package and deal with it as they did. Accordingly, the record needs to justify the police action in detaining this package for only that 55-minute period.

¶ 63                              6. *Did the Police Possess Specific, Articulable Facts,*
                                  *and Reasonable Inferences Derived Therefrom,*
                                  *To Create a Reasonable Suspicion To Detain the Package?*

¶ 64        Defendant asserts that police lacked a legitimate basis to detain the package because (1) the package possessed "no outward signs of involvement in criminal activity" and (2) the police canine failed to alert to the presence of narcotics. We disagree.

¶ 65 　　As we explained earlier, to justify their investigative detention of the package during the 55-minute time period applicable to this case, the police need to point to specific, articulable facts, and reasonable inferences derived therefrom, that create a reasonable suspicion of criminal activity. *Shapiro*, 177 Ill. 2d at 526, 687 N.E.2d at 69.

¶ 66 　　Although defendant asserts that the package possessed no outward signs of criminal activity because nothing observed by Young was by itself illegal, this position does not correctly convey the concept of reasonable suspicion. When, as here, a number of otherwise innocent characteristics, taken together, show that a package may contain contraband, reasonable suspicion that a crime is being committed may arise. See *United States v. Johnson*, 171 F.3d 601, 605 (8th Cir. 1999) ("Characteristics consistent with innocent use of the mail can, when taken together, give rise to reasonable suspicion."). For examples of circumstances giving rise to reasonable suspicion in the context of a shipped package, see *United States v. Lakoskey*, 462 F.3d 965, 971 (8th Cir. 2006) (reasonable suspicion existed when a package was shipped via express mail from known source state for narcotics and the shipping label listed a fictitious return address); *United States v. Gomez*, 312 F.3d 920, 922 (8th Cir. 2002) (reasonable suspicion existed when package was heavily taped around all edges and seams, sent from a known source city for narcotics and sent during a time of the week when law enforcement would supposedly be least active); and *United States v. Hernandez*, 313 F.3d 1206, 1208 (9th Cir. 2002) (reasonable suspicion existed when a package was shipped via overnight delivery from a known source state for narcotics, the return addressee could not be confirmed, and all seams were sealed with tape).

¶ 67 　　Moreover, defendant's assertion that no reasonable suspicion existed because the canine failed to alert to the package is not persuasive. To support his assertion, defendant cites this court's holding in *People v. Fondia*, 317 Ill. App. 3d 966, 970, 740 N.E.2d 839, 842 (2000), for the proposition that the failure of a canine to alert to the presence of narcotics automatically dispels reasonable suspicion. In *Fondia*, however, the dog's original alert to the car was the *only* reason for police to suspect that any individual occupant possessed drugs. *Fondia*, 317 Ill. App. 3d at 970, 740 N.E.2d at 842.

¶ 68 　　This case involves a scenario much different than that of *Fondia*. As noted earlier, police in this case were aware of *multiple* factors in support of their suspicion that the package contained narcotics. One of the suspicious factors was that the package was heavily taped around all edges and seams. This characteristic of the package aroused suspicion *specifically because* it evinced an effort to defeat the ability of a canine to detect the odor of narcotics. Unlike the situation presented in *Fondia*, the additional factors arousing suspicion in this case (we earlier discussed at length) continued to bear weight even after the dog failed to alert.

¶ 69 　　Therefore, we disagree with defendant that we should reverse the trial court's finding that the facts were sufficient to establish a reasonable, articulable suspicion that the package contained narcotics.

¶ 70 　　　　　　　*7. The Length of the Police Detention of the Package*

¶ 71 　　Having concluded that the police had the requisite reasonable suspicion to detain the

-13-

package, we now turn to the length of the police detention of defendant's package. A warrantless seizure does not violate the fourth amendment if the manner in which it is conducted is objectively reasonable when viewed under the totality of the circumstances. *People v. Lampitok*, 207 Ill. 2d 231, 241, 798 N.E.2d 91, 99 (2003) (citing *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S. Ct. 417, 421 (1996)). The reasonableness of a detention and investigation of personal property "depends largely upon investigatory diligence and the length of detention." *Shapiro*, 177 Ill. 2d at 528, 687 N.E.2d at 70 (*citing United States v. Place*, 462 U.S. 696, 709-10, 103 S. Ct. 2637, 2645-46 (1983)).

¶ 72 As explained earlier, the time of the police detention was from 8:30 a.m. (when the package was to be delivered) to 9:25 a.m. (when the judge issued the search warrant).

¶ 73 Both defendant and the State maintain that the seizure ended at 11:30 a.m., when the package was "delivered" to 656 S. Fairview, but we do not agree. Although 11:30 a.m. marked the point in time when an empty cardboard box was placed on the front porch of 656 S. Fairview, the controlled delivery of an empty cardboard box was a meaningless gesture. Thus–as we have previously explained–the warrantless seizure ended at 9:25 a.m., when Judge Holder White issued the warrant authorizing the police to search and seize the package. See *United States v. Van Leeuwen*, 397 U.S. 249, 252, 90 S. Ct. 1029, 1032 (1970) (the length of a warrantless seizure of a package is determined by measuring the time from the beginning of the seizure to the issuance of the search warrant). At that point in time, of course, the seizure was no longer warrantless. *Van Leeuwen*, 397 U.S. at 253, 90 S. Ct. at 1032.

¶ 74 Given that the length of the police detention was 55 minutes–a relatively short period of time–we conclude that under the facts of this case, the police detention for that period of time was reasonable. See *Van Leeuwen*, 397 U.S. at 253, 90 S. Ct. at 1033 (holding that a 29-hour warrantless seizure was not unreasonable); *Gomez*, 312 F.3d at 925 (holding that a 12- to 14-hour investigative detention by the police before they obtained probable cause was not unreasonable); *United States v. Ganser*, 315 F.3d 839, 844 (7th Cir. 2003) (holding that a four-day delay in the delivery of a letter was not unreasonable). In other words, we conclude that the police possessed specific, articulable facts, and rational inferences derived therefrom, to justify the brief 55-minute detention of the package.

¶ 75 Accordingly, we reject defendant's contention that the trial court erred by denying his motion to suppress.

¶ 76 B. Defendant's Claim That He Received
Ineffective Assistance of Trial Counsel

¶ 77 Separate and apart from the police detention of the package, defendant claims that his trial counsel was ineffective for failing to file a motion to suppress the evidence found in his truck following his arrest. We disagree.

¶ 78 A defendant bringing an ineffective-assistance-of-counsel claim must demonstrate both that (1) his counsel's performance was deficient to the extent of "[falling] below an objective standard of reasonableness" and (2) there exists a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.

*People v. Wheeler*, 401 Ill. App. 3d 304, 313, 929 N.E.2d 99, 107 (2010) (citing *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 2064 (1984)). "Where the defendant fails to prove prejudice, the reviewing court need not determine whether counsel's performance constituted less than reasonable assistance." *People v. Richardson*, 401 Ill. App. 3d 45, 47, 929 N.E.2d 44, 47 (2010).

¶ 79        "Probable cause to arrest exists when the facts known to the officer are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime." *People v. Wear*, 229 Ill. 2d 545, 563, 893 N.E.2d 631, 642 (2008). Defendant claims that because he "only placed the note in the door," and did not actually retrieve the package from the porch after it had been delivered, there was no probable cause to believe he committed a crime. However, as noted earlier, the police discovered a large amount of cocaine in a package addressed to a "Ranae Burton" of 656 S. Fairview, Decatur, Illinois, and after setting up surveillance at that location, observed defendant arrive and place a note in the front door, which read "ATT. I HAD TO LEAVE FOR WORK. JUST LEAVE THE PACKAGE ON PORCH. THANK YOU[,] RANAE." These facts alone were sufficient to lead a reasonably cautious person to believe that defendant was–at a minimum–participating in the trafficking of cocaine.

¶ 80        Because probable cause existed to arrest defendant and search his truck incident to that arrest, we conclude that trial counsel's alleged failure to file a motion to suppress the evidence obtained incident to that arrest did not prejudice defendant. Had such a motion been filed, it would have been denied.

¶ 81        In so concluding, we note that the search at issue was conducted pursuant to *New York v. Belton*, 453 U.S. 454, 457, 101 S. Ct. 2860, 2862 (1981) (a vehicle search incident to arrest may be conducted when it is substantially contemporaneous with the occupants' arrest), and before *Belton* was limited in scope by the United States Supreme Court in *Arizona v. Gant*, 556 U.S. 332, ___, 129 S. Ct. 1710, 1720 (2009) (adopting a new, two-part rule under which an automobile search incident to a recent occupant's arrest is constitutional if (1) the arrestee is within reaching distance of the vehicle during the search or (2) the police have reason to believe that the vehicle contains "evidence relevant to the crime of arrest" (internal quotation marks omitted)). Since its holding in *Gant*, however, the Supreme Court has held that searches conducted in objectively reasonable reliance on the binding precedent of *Belton* are "not subject to the exclusionary rule." *Davis v. United States*, ___ U.S. ___, ___, 131 S. Ct. 2419, 2423-24 (2011). Therefore, even if the search of defendant's vehicle incident to his arrest violated *Gant*, evidence obtained pursuant to that search would not be subject to the exclusionary rule because the police were acting in reasonable reliance upon *Belton*, which was the law at the time of defendant's arrest.

¶ 82        Having concluded that defendant was not prejudiced, we need not address the reasonableness of counsel's performance. *Richardson*, 401 Ill. App. 3d at 47, 929 N.E.2d at 47.

¶ 83                        C. Defendant's Claim That the Trial Court
                        Erred by Imposing a 25-Year Sentence

¶ 84 Finally, defendant claims that the trial court erred by imposing a 25-year sentence. Specifically, defendant contends that the court erred by fashioning his sentence under the mistaken belief that the applicable sentencing range for controlled substance trafficking is 18 to 160 years when, in actuality, the statutory range is only 18 to 80 years (720 ILCS 570/401(a)(2)(B), 401.1(b) (West 2006)). Because we conclude that defendant has forfeited this argument, we decline defendant's invitation to address it.

¶ 85 Fourteen years ago, in *People v. Reed*, 177 Ill. 2d 389, 394, 686 N.E.2d 584, 586 (1997), the supreme court first explained that section 5-8-1(c) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/5-8-1(c) (West 1994)) requires a written postsentencing motion to "allow the trial court the opportunity to review a defendant's contention of sentencing error and save the delay and expense inherent in appeal if they are meritorious." Following *Reed*, this court has repeatedly held that section 5-8-1(c) of the Unified Code (730 ILCS 5/5-8-1(c) (West 1994)), what is now section 5-4.5-50(d) of the Unified Code (730 ILCS 5/5-4.5-50(d) (West 2010)), "mandates that a defendant's challenge to any aspect of his sentence be made by a written motion filed within 30 days of the imposition of his sentence." *People v. Ahlers*, 402 Ill. App. 3d 726, 731-32, 931 N.E.2d 1249, 1254 (2010) (citing this court's holding in *People v. Montgomery*, 373 Ill. App. 3d 1104, 872 N.E.2d 403 (2007), and *People v. Rathbone*, 345 Ill. App. 3d 305, 310-11, 802 N.E.2d 333, 337 (2003) (strict enforcement of section 5-8-1(c) is necessary to allow the trial court to review the precise claim of error so that it can either (1) correct its mistake or (2) explain its reasons for imposing the sentence it did)).

¶ 86 We note that defendant, apparently in an effort to overcome the above-cited body of law, attempts to assert that plain-error review applies and his sentence is void because the trial court held the mistaken belief that he was subject to an extended-term sentence of up to 160 years. Assuming his contention that the court's belief was mistaken is correct, his plain-error claim lacks any merit because the court did not impose an extended-term sentence.

¶ 87 Accordingly, we conclude that defendant has forfeited his claim that the trial court erred by imposing a 25-year sentence.

¶ 88                                    III. CONCLUSION

¶ 89 For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State its $50 statutory assessment against defendant as costs of this appeal.

¶ 90 Affirmed.