Argued and submitted February 11, 2014, affirmed May 20, petition for review allowed October 9, 2015 (358 Or 69)

**STATE OF OREGON,**
*Plaintiff-Appellant,*

*v.*

**MAX BARNTHOUSE,**
aka Max Davis Barnthouse,
*Defendant-Respondent.*

Multnomah County Circuit Court
120431515; A153361

350 P3d 536

David B. Thompson, Senior Assistant Attorney General, argued the cause for appellant. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Stephen A. Houze argued the cause and filed the brief for respondent.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Police removed a package intended for delivery to defendant from the stream of mail at a United States Postal Service sorting facility. A drug-detection dog alerted to the presence of narcotic odor in the package. Later, without a warrant, the police took the package to defendant's residence and obtained defendant's consent to search the package and his bedroom. Based on the evidence discovered, defendant was charged with one count each of unlawful possession of marijuana, ORS 475.864, and delivery of marijuana for consideration, ORS 475.860. The trial court concluded that the police unlawfully seized the package in violation of both the Oregon and United States constitutions when they removed it from the stream of mail and that they subsequently exploited that seizure to gain defendant's consent to the searches. The court therefore suppressed all evidence obtained pursuant to the seizure and subsequent search. The state appeals that pretrial order. According to the state, defendant had no constitutionally cognizable possessory interest in the package, and, therefore, the police did not unlawfully seize it. The state argues, in the alternative, that, even if the police did illegally seize the package, they did not exploit that illegality in obtaining defendant's consent to the searches. For the reasons explained below, we affirm the trial court's order.

### I.  FACTS

We base our statement of the facts on the trial court's findings. "If findings of historical fact are not made on all pertinent issues and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the court's ultimate conclusion." *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993).

As part of an inter-agency drug interdiction team, United States Postal Inspector Helton and Portland Police Bureau (PPB) Officers Castaneda and Groshong regularly examine in-transit U.S. mail at a postal air cargo center near the Portland International Airport for packages that might contain illegal drugs or drug money. Postal

inspectors are federal law enforcement agents. At the hearing on defendant's motion, Helton testified that his primary duties pertain to the interdiction of drugs and drug money. Although he has the authority under federal law to handle (*e.g.*, deliver) mail, that is not his assigned job. According to Helton, when PPB officers are present at the sorting facility, they are operating under his authority in their handling of the mail and assisting him with his duties. Indeed, pursuant to postal regulations, nonpostal employees in a postal facility must be escorted by an employee.

The air cargo center is a secure facility. The public is not allowed there, and there is no customer service located at the air cargo facility. So, an intended recipient could not show up and pick up a package there. However, Helton testified that there is "a time along this path of delivery, that the public could intercede"; "a customer could go to their local post office and say I'm expecting an express mail package, if you could hold it out and let me pick it up early in the morning, I know that postal employees will provide that service for customers, * * * [b]ut before then there's not a chance for the public to interact with, you know, with postal employees."

When examining and investigating packages at the sorting facility, the interdiction team typically follows the same basic routine. Early in the morning, large bags of mail are offloaded from incoming flights. Bags containing express mail are clearly distinguished from other bags. Postal employees open the bags and empty their contents into large sorting bins. Express mail packages are sorted in a separate area from priority mail. Postal employees sort through the express mail bins to track and route packages to their final destinations. They place the packages into express mailbags that are designated to be delivered to a specific post office, from which a postal carrier takes and delivers the package to the intended recipient by the time specified on the face of each package, typically, either by noon or 3:00 p.m. that day, depending on the delivery location. As the postal employees are sorting through the bins, members of the interdiction team stand next to the bins and inspect their contents for packages that they believe may contain contraband.

They look for packages bearing exterior indicators that they deem characteristic of illegal-drug or drug-money parcels. Such indicators include the "overtaping" of a package's seams; handwritten, as opposed to printed, shipping information; delivery from an individual to an individual, rather than to or from a business entity; variation between the zip code from which a package was sent and the zip code listed for the return address; payment for delivery by cash or debit card, instead of billing to a business account; origination from a non-medical-marijuana state; waiver of any signature requirement at delivery; and use of possibly fictitious or incomplete identifying information for the sender or recipient. Helton testified that it is common for the public to send express mail packages using handwritten labels and for people, including himself, to use cash to pay their fee.

If, based on the presence of one or more of those indicators, the interdiction team decides to investigate a package, they then remove the parcel "from the normal stream of mail" to a "secondary" area 30 feet away from the sorting bins to subject it to a narcotics canine deployment line. They place the package on the floor in a line with six other "control" packages, and Groshong deploys his narcotics dog, Nikko, to examine the packages. Groshong testified that Nikko has an accuracy rate of approximately 90 percent, indicating that, about 10 percent of the time, Nikko alerts to packages that do not actually contain narcotics. Conversely, Nikko has also failed to alert to packages at the sorting facility that were later determined to contain contraband.

The package is then set aside for further investigation, *whether or not* Nikko alerts to it. At that point, there is "no chance it's going to get back into the stream of mail." Rather, it is "under [Helton's] control in a law enforcement sense." It is placed on a cart, separate from the standard sorting bins, with other express mail packages that the team is "holding out for that day" for investigation. The team conducts between 30 to 40 lineups each day. About seven to 14 parcels are set aside daily for further investigation. According to Groshong, the team currently investigates a greater relative number of packages that have elicited no

alert from Nikko than in the past. Helton testified that postal employees know that those are "my packages, and I need to hold onto those" from then on; postal employees are prohibited from tampering with or attempting to deliver those packages.

As the team continues to examine and identify packages for further investigation, they may also begin to investigate packages already set aside that morning by, for example, searching law enforcement databases for information related to the addresses or names listed on the packages. Finally, as Helton testified, for each package, "that same day, usually by delivery time, we try to make contact with the intended recipient." As Castaneda elaborated, the team takes each package to its delivery address, they "knock on the door with the package, usually accompanied by a postal inspector, and try to get consent to open the package, or wherever basically that investigation takes us."

Helton testified that it is United States Postal Service (USPS) policy that a federal search warrant must be obtained to open packages coming through the U.S. mail, but noted that "[o]ne of the exceptions to the search warrant requirement, under both the federal and state constitution[s,] * * * is consent of someone who has an expectation of privacy in that particular package." Helton, Castaneda, and Groshong each testified differently regarding the authority of PPB officers to seek a search warrant. Helton stated that PPB officers can apply for a state warrant and serve as the affiant for federal search warrants as well. Groshong stated that PPB officers are prohibited by USPS policy from applying "for search warrants in these types of cases." And, according to Castaneda, the responsibility for applying for a search warrant for their investigations usually rests with the individual officer who leads the "knock-and-talk" ultimately conducted at the address of the intended recipient.

The officers also testified concerning how long it would take to obtain a warrant. Groshong estimated that it typically takes several hours to obtain a federal search warrant: the time spent preparing the affidavit; finding an Assistant United States Attorney to review the warrant

(1-2 hours); and getting an appointment with a federal judge (1-2 hours). Helton has previously applied for federal search warrants to open U.S. mail, and for Oregon search warrants as well. He is familiar with the process for telephonically obtaining federal search warrants but has never done so. He does not know how long it would take to get a state search warrant by phone, although he knows that there is always a duty judge available to officers by phone specifically for that purpose in Multnomah County. Castaneda stated that he has applied for a search warrant in Multnomah County several times after identifying suspicious parcels at the postal air cargo center.

One morning, Helton, Castaneda, Groshong, and another PPB officer, Francas, were examining express mail packages as they were being sorted at the air cargo center. At about 6:00 a.m., Castaneda noticed a package with handwritten labeling, sent from Delaware (a non-medical-marijuana state), with an originating zip code different from the sender's zip code. The package was addressed to "Maxi-pad Barnt"; was paid-for by cash or debit card, with no phone number listed for either the sender or recipient; and had a signed and highlighted signature-waiver box. The package was scheduled to be delivered by noon that day. Helton later testified that he believed that the clerk who had accepted the package in Delaware was likely the one who highlighted the waiver signature box, stating that that is a "typical" practice.

Castaneda placed the package in a dog-deployment line, and Nikko alerted to the package. Castaneda "took custody of the parcel," gave it to Helton, and returned to examining the bins for other packages that might contain contraband. Helton searched law-enforcement databases for any information related to the shipping information on the package. Helton's search did not reveal any information suggesting that either the recipient's address or the sender's address were associated with any criminal activity, and the officers had no prior knowledge or suspicion of defendant being involved in any criminal activity. Helton did discover, though, that, not surprisingly, no one named "Maxi-pad Barnt" lived at the intended recipient's address and that the

sender's apartment number as listed on the package ("C7") differed from the apartment number that Helton found for the sender ("C27").

After completing their examination of the sorting bins, the interdiction team (Castaneda, Groshong, Francas, and Helton) conducted follow-up investigations into packages that they had identified that morning as suspicious. Groshong testified that all of the "local follow-ups" that day "for the Portland area were knock-and-talk follow-ups." At 9:30 a.m., the team arrived at defendant's residence with the package. Nobody had attempted to obtain a search warrant during the three-and-a-half-hour period between the positive dog-alert and arriving at defendant's residence. According to Helton, he and Castaneda decided together not to apply for a search warrant in this case. Castaneda testified that nothing impeded his ability to apply for a search warrant that morning. When asked on cross-examination why he did not apply for a warrant, Castaneda replied, "I—I—there's other ways of opening the package." The following colloquy then took place:

"[DEFENSE COUNSEL:] You didn't have to go through the trouble of trying to get a search warrant, did you?

"[CASTANEDA:] No, I did not.

"Q Okay. Instead, you went to the residence and tried to talk your way in and to try to get consent.

"A Correct."

Once at defendant's residence, Castaneda knocked on the front door and two individuals answered. One was a resident of the home, and the other was a friend staying there. Castaneda identified himself as a Portland police officer and asked if either of them was expecting a package. After they replied that they were not, Castaneda asked them if they recognized the name of the addressee. They answered that it was probably for defendant, who lived at the residence. Castaneda asked if he could use the roommate's cell phone to call defendant, whose number was listed in the phone, from inside the residence, and the roommate consented.

Castaneda placed the call, and defendant answered. Castaneda identified himself as a Portland police officer and asked with whom he was speaking. Defendant gave Castaneda his name. Castaneda explained to defendant that "he was not under arrest, but that I was investigating a suspicious parcel going to the residence." Defendant responded that he was not expecting any package. Castaneda replied that the other individuals at the house stated that they were not expecting a package, and that the name on the parcel was similar to defendant's name. Defendant repeated that he was not expecting any package.

Castaneda asked defendant for consent to open the parcel. According to Castaneda, defendant "was a little hesitant at first." Castaneda told defendant that he could deny consent and repeated that he was not under arrest. Castaneda then stated that, if defendant denied consent, he would apply for a search warrant. Defendant acquiesced, and Francas opened the package, inside of which were several stacks of currency wrapped in a t-shirt. Castaneda told defendant what they had found in the package. Defendant told Castaneda that the money was not his and that he was not expecting any money.

Castaneda then told defendant that he was continuing the investigation and asked defendant for consent to search his bedroom for evidence of narcotics distribution and money laundering. Defendant replied that he was not sure that he wanted to consent. Castaneda repeated that defendant was not under arrest and that he had the right to refuse consent, but that if he did, Castaneda would apply for a warrant to search the residence. Defendant then consented to a search of his bedroom. At that point, according to Castaneda, "it seemed like [defendant] was getting really nervous," and defendant stated that "he wanted to get off the phone." Castaneda gave defendant his contact information, and the phone call ended. Upon searching defendant's bedroom, the police discovered a large amount of marijuana, packaging materials similar to the parcel detained that morning, and a vacuum sealer.

The package did not leave the officers' physical possession during the time that they were at the house.

The officers maintained control and custody of the package during the knock-and-talk and the searches, and they took the package to the police property room after leaving defendant's residence. A warrant was never obtained. When asked by the deputy district attorney, "If there hadn't been a dog hit in this case, would you have changed anything about your investigation?" Castaneda replied, "No, I wouldn't. I would have continued. I would have still went to the house and continued the same way."

As noted above, based on the evidence discovered, defendant was charged with one count each of unlawful possession of marijuana, ORS 475.864, and delivery of marijuana for consideration, ORS 475.860. In a pretrial motion to suppress, defendant argued that, beginning with the initial detention of the package, the police made a series of warrantless seizures in violation of both Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. According to defendant, under both federal and state constitutional jurisprudence, he held protected privacy and possessory interests in the package the entire time that the police detained and investigated it. The police significantly interfered with that interest, argued defendant, when they removed the package from the sorting bin and detained it for a dog sniff. Defendant contended that, at all points in time, the police lacked probable cause to seize the package and that no exception to the warrant requirement applied to excuse their unlawful conduct. Defendant also asserted that the police lacked reasonable suspicion to support the initial seizure of the package from the sorting bin and that, in any case, with regard to Article I, section 9, reasonable suspicion does not excuse warrantless investigative detentions of property. Additionally, defendant argued that the police planned to and did in fact exploit their initial, unlawful detention of the package to evade the necessity of obtaining a warrant by gaining defendant's consent to seize and search the package and search his bedroom. According to defendant, his consent was not free and voluntary, and all of the evidence gathered subsequent to and as a result of the original seizure was fruit of the poisonous tree. Defendant moved to suppress all evidence gained from the unlawful police conduct, including evidence of the dog sniff,

the items found through the searches of the package and of defendant's residence, and the statements that he made to Castaneda on the phone.

The state responded that defendant's possessory interest in the package was limited under federal law—and should be likewise limited under state law—to a reasonable expectation that the package would not be detained by postal employees beyond the guaranteed delivery date and time. Therefore, the state argued, when the interdiction team removed defendant's package from the normal stream of mail, they did not "seize" the package for purposes of Article I, section 9, or the Fourth Amendment. The state reasoned that, because Helton and Castaneda took the package to defendant's residence before the guaranteed delivery time, at a point when defendant had no right yet to exercise any dominion or control over the package, there was no state action that sufficiently interfered with any possessory interest of defendant's. The state argued, in the alternative that, even if the package was seized pursuant to Article I, section 9, and the Fourth Amendment, there was reasonable suspicion to effect that seizure. The state also contended that, even if the detention of the package constituted a seizure that was unsupported by reasonable suspicion, defendant's consent was independent of, or only tenuously related to, the unlawful police conduct and represented an intervening act that purged the taint of any prior law enforcement illegality.

The trial court granted defendant's motion to suppress. The court determined:

"[F]or a starting point *** there was a seizure for sure at the time that the officer is on the telephone with the defendant and the officer is trying to get consent for a search, and the officer tells the defendant that if he denied consent then the officer would apply for a search warrant. At that point, the item has already—the package has already been seized.

"And so now, we go backwards from there ***.

"*****

"*** [T]he seizure happened at the time that the officer took the package and set it aside, and already had determined, according to his testimony that regardless of the

dog sniff test results, \* \* \* that this package was set aside for a delivery by the police officer and the postal employee, and that the plan was already set in place that that's what was going to happen with this package.

"\* \* \* \* \*

"So we have to look at, is there reasonable suspicion or probable cause there at that moment, and this is all happening before there is even the information about the dog alerting or not alerting. So the court is going to find under the totality of the circumstances here, that at that moment in time, that the officers did not have probable cause, or didn't have reasonable suspicion under either of the standards[.]"

The court also concluded that "it is a, essentially a connect-the-dots case, and that there was exploitation here to the purported consent, and so the consent would not be valid here because of the exploitation." On appeal, the state renews its seizure and exploitation arguments. The state does not renew its argument that, under Article I, section 9, reasonable suspicion may support the warrantless investigative detention of an in-transit express mail package.

## II.   ANALYSIS

We begin with the basic legal framework relevant to this appeal. Article I, section 9,[1] protects individuals from unreasonable government seizures and searches of their persons, property, or private effects. *State v. Davis*, 237 Or App 351, 354-55, 239 P3d 1002 (2010), *aff'd*, 353 Or 166 (2013). In a criminal prosecution, the state may not use evidence that the government obtained as a result of an unreasonable seizure or search. *State v. Davis*, 313 Or 246, 253, 834 P2d 1008 (1992). A seizure occurs when there is a significant interference with an individual's possessory interests in a piece of property. *State v. Owens*, 302 Or 196, 207, 729 P2d

---

[1] It is this court's "duty to interpret the protections afforded Oregonians by our state constitution independently from the federal constitution[.]" *State v. Owens*, 302 Or 196, 201, 729 P2d 524 (1986). Even if the government obtained the evidence consistently with the federal constitution, the evidence is not admissible in a state criminal prosecution unless it was also obtained consistently with the state constitution. *State v. Davis*, 313 Or 246, 254, 834 P2d 1008 (1992). Because we resolve this case on state law grounds, we need not and do not reach the federal constitutional question. *State v. Hitchcock/Winters*, 224 Or App 77, 83, 197 P3d 33 (2008).

524 (1986). A search occurs when the government invades an individual's privacy interests. *Id.* at 206. A seizure or search is unreasonable if it is not authorized by a warrant (supported by probable cause) or otherwise justified under an exception to the warrant requirement. *State v. Kosta,* 304 Or 549, 553, 748 P2d 72 (1987). Voluntary consent is one such exception, unless the government exploited an unreasonable seizure to obtain that consent. *State v. Unger,* 356 Or 59, 74-75, 85, 333 P3d 1009 (2014).

Here, the trial court concluded that the police unreasonably seized the package when they removed it from the sorting bin and detained it. The trial court also determined that the police obtained defendant's consent to the subsequent searches of the package and his room by exploiting the unreasonable seizure of the package. In a single assignment of error, the state advances a set of alternative arguments aimed at each of the trial court's determinations. We must reverse if the state prevails on any of those arguments.

A. *Seizure*

We first address the state's arguments that no seizure of defendant's property occurred under Article I, section 9. Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

As noted, the state's argument centers on its assertion that, due to the timing of the officers' detainment of the package and their arrival with it at defendant's residence, defendant had no cognizable possessory interest in the package.

Not all governmental intrusions trigger the protections guaranteed by Article I, section 9. *State v. Juarez-Godinez,* 326 Or 1, 5, 942 P2d 772 (1997). Article I, section 9, applies only when government officials engage in a "search" or a "seizure." *State v. Howard/Dawson,* 342 Or 635, 639, 157 P3d 1189 (2007). A "seizure" of property occurs "when there is a significant interference, even a temporary one, with a

person's possessory or ownership interests in the property."[2] *Juarez-Godinez*, 326 Or at 6 (citing *Owens*, 302 Or at 207). If the government conduct did not interfere with a possessory or ownership interest, then no "seizure" occurred; as a result, Article I, section 9, is not implicated, and our inquiry ends. *Cf. Davis*, 237 Or App at 355 (stating that principle in the context of unreasonable searches). Accordingly, we first consider whether defendant had a possessory interest in the package.[3]

### 1. *Possessory interest*

When the state seizes property without a warrant, as it did here, the state bears the burden of demonstrating that the defendant lacked a possessory interest in the property in question. *State v. Galloway*, 198 Or App 585, 591, 109 P3d 383 (2005). The issue of whether, and to what extent, the intended recipient of a package has a possessory interest in that package for purposes of the Oregon Constitution's prohibition of unreasonable seizures is a question of first impression in Oregon.

The Oregon Supreme Court previously approached, but did not reach, the issue in *Kosta*, which involved similar facts. In *Kosta*, the police, without a warrant, intercepted a Federal Express (FedEx) package on suspicion that it contained illegal narcotics. 304 Or at 551. After a drug-detection dog alerted to the package, the police obtained a telephonic warrant, opened the package and found cocaine inside of it. *Id.* at 552. They then resealed the package and made a controlled delivery to the addressee, Van Horn, who was arrested when he identified himself and admitted that he knew what was in the package. *Id.* Van Horn told the police that another person, McGraw, was actually the intended recipient of the package. Cooperating with the police, Van Horn called McGraw and told him that he could not deliver the package. McGraw then sent the defendant to pick up the package from Van Horn. The police arrested the defendant after he took possession of the package. *Id.*

[2] "[T]he fact that a seized item may be contraband does not prevent a defendant from having a cognizable property interest * * * in the item." *Kosta*, 304 Or at 553.

[3] Defendant does not argue that he had any ownership interest in the package.

The trial court found that the defendant was neither the addressee nor the intended ultimate recipient of the package and denied the defendant's motion to suppress for violation of Article I, section 9. *Id.* In affirming the trial court's denial of the motion, the Supreme Court in *Kosta* concluded:

"[W]e need not determine the bounds of an individual's Article I, section 9, interests to conclude that defendant lacked any privacy or possessory interest in the package at the time when the police intercepted the Federal Express truck and subsequently exposed the package to the trained narcotics detection dog. Although defendant argues that he 'was injured by the challenged police conduct,' he fails to articulate any basis for his alleged privacy interest to be free from governmental intrusion into the package, given that he did not cause the package to be transported and that he was not the addressee, the intended recipient or an individual with an otherwise identifiable interest at the time of the detention of the package. Consequently, there is no basis for defendant to assert a possessory or ownership interest in the package during transit. We hold that defendant's Article I, section 9, interests were not violated by the police conduct involving the stop of the truck and the exposure of the package to the police dog."

304 Or at 553-54 (footnotes omitted). Defendant here urges us to conclude from that analysis that the Supreme Court in *Kosta* implicitly recognized that the addressee or intended recipient of a package has a possessory interest under Article I, section 9, in a package during shipment.

That is not an unreasonable inference to draw from *Kosta*. The court's analysis may reasonably be read as implying the following two conclusions: one, that a defendant has a basis to assert a possessory or ownership interest in a package during transit when the defendant caused the package to be transported or was "the addressee, the intended recipient or an individual with an otherwise identifiable interest at the time of the detention of the package"; and, two, more generally, that, when a defendant articulates a "basis for his alleged privacy interest to be free from governmental intrusion into [a] package," there may be a "basis for defendant to assert a possessory or ownership interest in the package

during transit." Here, the state does not dispute that defendant is the addressee and intended recipient. And, the state concedes that we have previously concluded that, for purposes of Article I, section 9, an addressee has a privacy interest in a mailed package. *See State v. Goin*, 101 Or App 503, 791 P2d 149 (1990).[4] However, such an inference is insufficient by itself to serve as the basis for resolving the question before us in this appeal. We thus turn to the state's argument.

The state primarily argues that defendant lacked a protected possessory interest in the package before the police searched it with his consent because, before that point, he had neither actual nor constructive possession of the package. According to the state, as a matter of law, absent such possession of a piece of property, a defendant has no constitutionally protected possessory interest in that property. The state notes that defendant never had actual possession—*i.e.*, physical control—of the package. Therefore, reasons the state, unless defendant had constructive possession of the package, he had no possessory interest to assert. And as the addressee of an express mail package, the state contends, defendant did not have constructive possession of the package before the guaranteed delivery time because, until that time, an addressee has neither the ability nor the right to control an in-transit express mail package in any manner.

The state bases the latter argument on contract law and USPS standards. According to the state, under contract law, before the guaranteed delivery time, the addressee is merely a third-party beneficiary of the contract between the sender and the USPS. As such, in the state's view, the addressee has no right or ability to exercise any control

---

[4] In *Goin*, a package was addressed and sent to "Cove Palisades State Park" at the park's regular mailing address. 101 Or App at 505. The park manager opened the package and found what he thought was narcotics. He showed the package to a police cadet. Only then did the park manager notice that, on the side opposite of the address label, the package was directed in writing to the attention of the defendant, who was staying at the park. We affirmed the trial court's denial of the defendant's motion to suppress for violation of Article I, section 9, reasoning that the park manager thought that the package was addressed to the park and was not looking for the defendant's property when he opened the package. *Id.* at 506. Therefore, we held, the act of opening the package was not a "search" under Article I, section 9, because it was not an intentional intrusion into the defendant's privacy. *Id.* A necessary, if implicit, conclusion for that holding is that the defendant had a protected privacy interest in the package addressed to him.

over the package until the guaranteed delivery time. So, for example, according to the state, an addressee has no right to show up at the particular post office facility from which the in-transit package will be delivered to plaintiff and intercept the package at that point. By contrast, contends the state, the sender of a package can exert such directing or restraining influence over the package. For example, the state points out, the sender of a domestic express mail package may recall or redirect the package while it is in transit. *See* USPS, *Mailing Standards of the United States Postal Service, Domestic Mail Manual* § 507.5.1, 695 (Mar 2, 2015) (*Mail Manual*) (describing the "package intercept" service available to mailers). According to the state, that service is not available to addressees.

For the most part, the state accurately summarizes the basic rules pertaining to constructive possession. A defendant's constructive possession of property may suffice to establish that the defendant has a protected possessory interest in that property under Article I, section 9.[5] *See State v. Bernabo*, 224 Or App 379, 387, 197 P3d 610 (2008) ("A defendant who has actual or constructive possession of property immediately before it is searched has a constitutionally protected possessory interest in that property."). It is also true that, generally, a defendant must have the right to exercise some kind of control or dominion over a piece of property to have constructive possession of that property. *State v. Barger*, 349 Or 553, 559, 247 P3d 309, *adh'd to as modified on recons*, 350 Or 233, 253 P3d 1030 (2011); *State v. Oare*, 249 Or 597, 599, 439 P2d 885 (1968) ("Evidence of the control or the right to control is necessary to constructive possession.").

We supplement the state's summary of constructive possession by adding that, although "[t]he verb 'control' is not statutorily defined, * * * its common meaning, as set out in *Webster's Third New Int'l Dictionary* 496 (unabridged ed 2002), is 'to exercise restraining or directing influence over : REGULATE, CURB.'" *Barger*, 349 Or at 559 Additionally,

---

[5] We express no opinion regarding whether, as the state argues, such possession is *necessary* to establish a protected possessory interest in a piece of property.

we clarify that, "when the court in *Oare* and other cases referred to a 'right' to control a thing, it was referring to something akin to a legal right to do so * * *." *Barger*, 349 Or at 564 (emphasis omitted). Furthermore, a defendant may have constructive possession or control of an item even when that defendant is unable to actively exercise directing or restraining influence over the item. *Id.* at 566 n 12. For example, when a defendant who has constructive possession of some item "places that item in the custody of another person, he or she can retain constructive possession by retaining the *power* to control the item, regardless of whether he or she actively exercises that power." *Id.* (emphasis in original); *cf. State v. Tanner*, 304 Or 312, 323, 745 P2d 757 (1987) (rejecting the state's argument that the defendant did not have a protected privacy interest in property that he stole because the defendant had entrusted that property to others and, thus, "had no immediate right of access" to it; reasoning that, "[s]o long as there remained a possibility that defendant would reclaim the effects, the entrustment was sufficiently viable to demonstrate that the illegal search of the [entrustees'] residence violated his privacy interests under section 9"); *see also Black's Law Dictionary* 1353 (10th ed 2014) (defining "possessory interest" as "[t]he present right to control property, including the right to exclude others, by a person who is not necessarily the owner").

Where the state's argument founders is in its application of those rules in the context of the USPS mail. We do not take issue with the state's conclusion that the sender of an express mail package retains a possessory interest in the package in transit. Under the USPS standards, even after the mailer has deposited the package in the mail (*i.e.*, no longer has actual possession), she may recall or redirect it remotely. The standards thus grant the mailer "something akin to a legal 'right' to control" the package. *Barger*, 349 Or at 564 (emphasis omitted), which, in turn, connotes constructive possession sufficient to establish a protected possessory interest.

We do, however, take issue with the state's conclusion that the addressee does not have a possessory interest in an in-transit express mail package. That conclusion is directly contradicted by Helton's testimony at the

suppression hearing that, before delivery, there is "a time along this path of delivery, that the public could intercede." According to Helton, "a customer could go to their local post office and say I'm expecting an express mail package, if you could hold it out and let me pick it up early in the morning, I know that postal employees will provide that service for customers."

The state's conclusion is further undermined by the USPS standards, which the state itself cited as a source of a mailer's possessory interest in an express mail package. Those standards make it clear that "[a]ddressees may control delivery of their mail." USPS, *Mail Manual*, § 508.1.1.1 at 711. Specifically, under the "Recipient Services" section of the manual, the standards provide for a "Hold For Pickup" service, which "allows mailpieces [including express mail] to be held at a designated Post Office location for pick up by a specified addressee or designee." USPS, *Mail Manual* § 508.7.2.1 at 743; *see also* USPS, *Hold For Pickup Service Expanded*, MailPro 6 (Jan/Feb 2011) ("The 'Hold For Pickup' service * * * provid[es] customers with more options to have packages held at a Post Office until they're able to pick them up * * *."). Indeed, a recipient who would "like to redirect an incoming package to a Post Office for pickup * * * can select Hold For Pickup using USPS Package Intercept," the very service that the state asserted was unavailable to addressees. USPS, Track & Manage, *I don't want to receive mail at home: Hold for Pickup*, https://www.usps.com/manage/welcome.htm (accessed May 14, 2015).

In short, the USPS standards and Helton's testimony both indicate that an addressee of an express mail package has something akin to a legal right to control—*i.e.*, to exercise restraining or directing influence over—a package (addressed to the addressee) while that package is in transit. Under the case law summarized above, that evidence is sufficient to establish an addressee's constructive possession of such a package and, therefore, the addressee's constitutionally protected possessory interest in that package.

The USPS standards and Helton's testimony also both indicate that an addressee's possessory interest in an in-transit express mail package vests once the package has

been deposited in the stream of mail. The package-intercept service that the USPS directs the recipient to use in order to divert a package to a post office for pickup is available at any point after the package has been sent, prior to its delivery or release for delivery. *See* USPS, Package Intercept, *How It Works*, https://retail-pi.usps.com/retailpi/actions/index.action (accessed May 14, 2015) (so stating). And, as noted above, Helton testified that an addressee can "go to their local post office and say I'm expecting an express mail package, if you could hold it out and let me pick it up early in the morning, I know that postal employees will provide that service." In other words, the addressee can request hold-for-pickup service at a post office the day before the package's arrival at that facility. Here, the facts summarized above establish that, generally, express mail packages addressed within Oregon arrive at the air cargo facility on the morning of the day that they are delivered and that, specifically, the package addressed to defendant arrived at that facility at 6:00 a.m. with a guaranteed delivery time of 12:00 p.m. later that day. Thus, as Helton testified, defendant could have exercised his ability to intercept the package as early as the day before Castaneda removed it from the sorting bin. Indeed, under the USPS standards, defendant could have exercised that ability before that point: essentially, at any point after the sender placed the package in the mail in Delaware.

In light of the foregoing evidence, the state's invocation of contract law does little to save its argument. The state contends that an addressee's limited possessory interest in an express mail package is based, in part, on the addressee's status, under contract law, as a third-party beneficiary of the contract between the sender and the USPS. The state cites to no Oregon authority, whether case law or statute, to support that proposition. Instead, the state points to a pair of federal circuit court decisions and invites us to adopt the reasoning of those opinions. We decline to do so because, as we explain below, we find the reasoning in those decisions to be ultimately unpersuasive.

The state relies, specifically, on *United States v. Jefferson*, 566 F3d 928 (9th Cir 2009), and *United States v. LaFrance*, 879 F2d 1 (1st Cir 1989). In *Jefferson*, the defendant was the addressee of a USPS express mail package

with a guaranteed delivery time of 3:00 p.m. on April 7, 2006. 566 F3d at 931. The government detained the package from the morning of April 6 to the morning of April 7, at which point a postal inspector examined the package's exterior and submitted it to a dog sniff. After the drug dog alerted to the package, the government applied for and obtained a search warrant, opened the package, and discovered illegal narcotics inside. Law enforcement officers later made a controlled delivery of the package to the defendant at about 5:00 p.m. (two hours after the guaranteed delivery time), and the defendant was arrested after opening the package. *Id.* at 932.

In his appeal from the district court's denial of his motion to suppress the narcotics, the defendant argued, *inter alia*, that, under the Fourth Amendment, the detainment of his package violated his constitutionally protected possessory interest in the package. The Ninth Circuit affirmed. That court framed the question before it as "whether a contractually guaranteed delivery time affects the Fourth Amendment possessory interest of a package's sender or recipient." *Jefferson,* 566 F3d at 934 (noting that that question had been "explicitly left unanswered" in an earlier opinion, *United States v. Hoang,* 486 F3d 1156 (9th Cir 2007), *cert den,* 552 US 1144 (2008)); *see Hoang,* 486 F3d at 1162 n 5 ("We observe that the terms of service in the contract between the sender and FedEx may also alter the expectations of the sender or the recipient and may very well affect a subsequent court's analysis of the propriety of any FedEx-approved inspection and diversion of packages.").

To answer that question, the court in *Jefferson* looked to *LaFrance,* the facts of which the court in *Jefferson* summarized as follows:

"In *LaFrance,* per the instructions of law enforcement, a Federal Express employee alerted law enforcement that a package had arrived addressed to LaFrance. The package had arrived in the morning and delivery was guaranteed by 12:00 p.m. that day. Law enforcement directed the employee to deliver the package to the police department instead of LaFrance. The package arrived at the police department around 12:45 p.m., hence 45 minutes after the guaranteed delivery time. At about 1:15 p.m., the package

was subjected to a narcotics-detection canine sniff and the canine alerted to contraband."

566 F3d at 934 (citations omitted). After stating that, "[i]n this case, we observe no Fourth Amendment distinction between public and private package carriers,"[6] the Ninth Circuit concluded that the defendant in *LaFrance* "presented essentially the same arguments for suppression as those Jefferson * * * advances." *Jefferson*, 566 F3d at 934. The Ninth Circuit then quoted and adopted the First Circuit's reasoning from *LaFrance*:

> "The First Circuit observed that 'a possessory interest derives from rights in property delineated by the parameters of law, in this case, contract law.' [*LaFrance*, 879 F2d] at 7 * * *. The First Circuit noted the hornbook contract law principle 'that where a delivery time is agreed upon, a court should not intrude to imply a (different) reasonable time for delivery.' [*Id.* at 7 (citing John Calamari and Joseph Perillo, *Contracts* 46 (2d ed 1977)].

> "The First Circuit held that 'the only possessory interest at stake before Thursday noon was the contract-based expectancy that the package would be delivered to the designated address by morning's end. FedEx obligated itself to no more than that.' [*La France*, 879 F2d at 7.] * * *

> "The reasoning of *LaFrance* is convincing. We hold that an addressee has no Fourth Amendment possessory interest in a package that has a guaranteed delivery time until such delivery time has passed.[7] Before the guaranteed delivery time, law enforcement may detain such a package for inspection purposes without any Fourth Amendment curtailment."

*Jefferson*, 566 F3d at 934.

Neither *LaFrance* nor *Jefferson* offers any additional analysis to buttress the legal conclusion regarding

---

[6] Recall that *Jefferson*, like the instant appeal, involved a USPS express mail package, whereas *LaFrance* involved a package sent via FedEx.

[7] We note that that characterization of the holding in *LaFrance* does not square with the First Circuit's actual conclusion in that case that, before the guaranteed delivery time, the addressee of a package has a *minimal* possessory interest in the package, not *no* interest. *See, e.g., LaFrance*, 879 F2d at 7 (characterizing the defendant's possessory interest in the package prior to the guaranteed delivery time as "nearly evanescent").

the delimiting impact of contract law on an addressee's possessory interest in a package with a guaranteed delivery time. In the end, then, that conclusion rests on little more than a single citation to a "hornbook contract law" principle. That is insufficient to overcome the evidence summarized above pertaining to the nature and scope of an addressee's possessory interest in an express mail package.

Based on the evidence presented to the trial court, we conclude that defendant had a possessory interest in the package at the time that Castaneda and Helton removed it from the stream of mail and that he retained that right throughout the period during which the police investigated the package, including at the time that the police brought the package to his residence and obtained his consent to the searches of the package and of his bedroom. As to the nature and scope of that possessory interest, we conclude that, for an in-transit USPS express mail package, the police may not detain such a package without probable cause and a warrant or without the existence of one of the carefully delineated exceptions to the warrant requirement. That conclusion comports with our case law regarding possessory interests in other contexts.

For example, in *Galloway*, we concluded that the police violated the defendants' Article I, section 9, possessory interests in their garbage when they took the garbage from the curb in front of the defendants' home, where the defendants had placed it in anticipation of collection by a sanitation company, and subsequently searched that garbage. 198 Or App at 598. As relevant to this appeal, we reasoned that

"defendants had arrangements with garbage collection companies that specified where the garbage cans were to be placed for collection and when collection would occur. Defendants abided by those agreements by placing their garbage inside of garbage cans and placing the cans in the locations required for curbside collection.

"Thus, defendants placed their garbage cans and the contents of those cans in a particular place in order to facilitate a limited purpose, *viz.*, pick-up and disposal by a designated collection company. Defendants did not implicitly

authorize anyone else to paw through their garbage and view or take items of garbage. Rather, they placed their garbage in cans by the curb with the understanding that the garbage collection company—and only the garbage collection company—would remove the bags from the cans and carry the bags away.

"\* \* \* \* \*

"Finally, and contrary to the state's contention, defendants did, in fact, manifest an intent to retain control over the cans and their contents *vis-à-vis* the world at large. By securing garbage inside a closed, opaque container such as a trash can, contracting with a garbage collection company to take it away, and placing the cans, with their contents, at the specified collection point in anticipation of collection, defendants manifested an intent to maintain control over the contents until such time as the garbage company took it away."

*Id.* at 595-97.

We thus based our analysis in *Galloway* in large part on the absence of any evidence to support the inference that the defendants intended anyone but the garbage company to control the property, as well as the defendants' manifest intent to retain control of that property *vis-à-vis* the world at large. Underlying those considerations were several, interrelated factors: the defendants' contract-based expectations, the nature of the continuing relationship between the contracting parties (*e.g.*, the defendants' continuing rights with regard to the property), and the limited purpose of the arrangement between the contracting parties. Of particular importance was the conclusion that an intent to relinquish control of property to one party does not automatically equate to an intent to make the contents of that property—at that point in time—available for public inspection. *Id.* at 595-98.

To help illustrate that analysis, we adduced the following hypotheticals in *Galloway*:

"In the first circumstance, a homeowner leaves a box labeled 'Free Stuff, Help Yourself' in front of his or her house. In the second, the homeowner leaves a box labeled 'Stuff To Be Picked Up By Goodwill Only' in front of the

house. Under the state's analysis * * *, the two situations are materially indistinguishable—both would evince abandonment because, in both circumstances, the homeowner voluntarily left the box and its contents in a publicly accessible area outside his or her home and did not manifest any intention to retain control over the box and its contents.

"The two circumstances are, however, materially different. In the first, the homeowner has, in fact, abandoned any possessory interest in the contents of the box—the world at large is free to open the box and take the contents. In the second, the homeowner has relinquished her possessory interests in the contents of the box only *vis-à-vis* Goodwill, at least until Goodwill takes possession of the contents. * * *

"Here, defendants' circumstances are directly analogous to the second hypothetical, with the trash collection companies in the same position as Goodwill. Defendants placed their garbage in closed containers in front of their residences, manifesting to objectively reasonable third parties that the contents were to be collected only by a designated entity. Thus, defendants retained protected possessory interests in the contents of their garbage cans until that collection occurred."

198 Or App at 597-98.

We similarly conclude here that the recipient of an express mail package necessarily yields a certain degree of the right to possession to the USPS—but *only* to the USPS— for purposes of handling and delivering their mail. We think that it is reasonable to infer from the evidence above that defendant utilized the USPS to facilitate a limited purpose, namely, receipt of his property. By using express mail to accomplish that, defendant manifested an intent to retain control over the package and its contents *vis-à-vis* the world at large. *See, e.g.*, 39 USC § 404(c) (prohibiting inspection of first class mail "except under authority of a search warrant authorized by law, or by an officer or employee of the Postal Service for the sole purpose of determining an address at which the letter can be delivered, or pursuant to the authorization of the addressee"); USPS, *Mail Manual* § 113.2.2 at 34 ("Priority Mail Express matter is closed against postal inspection."). Furthermore, as discussed above, the recipient of an express mail package has a right to exercise control

over the course of his mail while it is in transit.[8] Were that not the case, the scope of defendant's possessory interest, if any, might be smaller. *See Howard/Dawson*, 342 Or at 641 (concluding that, because "defendants retained no more right to control the disposition of [their] garbage once they turned it over to the sanitation company," the police did not violate the defendants' Article I, section 9, possessory interests in their garbage when they seized it from the sanitation company after the company removed it from the defendants' residence).

Finally, we find additional support for our conclusion in the strong historical relationship between the USPS and the sanctity of the mails, which has itself influenced the development of search-and-seizure jurisprudence. "[T]he constitutional principle of communications privacy initially grew out of a particular institutional context; the constitutional principle was simply the affirmation of long-standing law and custom in the post office." Anuj C. Desai, *Wiretapping Before the Wires: The Post Office and the Birth of Communications Privacy*, 60 Stan L Rev 553, 557 (2007). In fact, Desai observes, "as a historical matter, it was the post office—not the Fourth Amendment of its own independent force—that originally gave us the notion of communications privacy that we now view as an abstract constitutional principle applicable to telephone conversations, e-mails, and the like." *Id.*

## 2. *Significant interference*

We also conclude that the government's conduct here, beginning with the removal of defendant's package from the mail stream, constituted a significant interference with defendant's possessory interest in the package. As

---

[8] We note that, because *Galloway* involved the collection of residential garbage, our analysis in that opinion necessarily recognized that the defendants retained their already-existing possessory interests in their garbage until the third-party carrier, the garbage company, took possession of it. By contrast, in the context of USPS express mail, a recipient's possessory interests in that mail inhere, as we have summarized above, even after the third-party carrier, the USPS, has taken possession of the property. That distinction has no bearing on the aspect of *Galloway* that is relevant to the instant appeal—namely, the analysis of the factors that indicate that a defendant may yield possessory interests in personal property (whether in part or in whole) to a third-party carrier while simultaneously maintaining those constitutionally protected interests as against all other parties, including the police.

noted above, the testimony at the suppression hearing indicated that it was the interdiction team's regular practice to remove any express mail package bearing certain combinations of indicia from the stream of mail and to set them aside for further investigation whether or not the drug-detection dog alerted to the package. According to Helton, at that point, such a package is "under [his] control in a law enforcement sense," and there is "no chance it's going to get back into the stream of mail." The team then takes the package to its delivery address to, as Castaneda stated, "try to get consent to open the package." Finally, as Helton testified, for each package, "that same day, usually by delivery time, we try to make contact with the intended recipient." As Castaneda elaborated, the team takes each package to its delivery address, they "knock on the door with the package, usually accompanied by a postal inspector, and try to get consent to open the package, or wherever basically that investigation takes us."

That is precisely what the government did with respect to defendant's package. After observing the indicia noted above, Castaneda removed the package from the stream of mail, submitted it to a dog sniff, and, in his own words, "took custody" of it. The interdiction team took the package to defendant's home to try "to talk [their] way in and to try to get consent." The team informed defendant that they had the package and that, if he did not consent to a search, they would apply for a warrant. The package did not leave the officers' physical possession during the time that they were at the house. Rather, the officers maintained control and custody of the package during the knock-and-talk and the searches.

In so doing, the interdiction team quite literally dispossessed defendant of the package. The state highlights the fact that the officers never expressly *said* that they would withhold the package even if defendant had explicitly demanded that they leave it at the residence. However, given the evidence, it is reasonable to infer that defendant understood, and that the officers indeed intended to imply, that they would maintain possession of the package while a warrant was sought if defendant did not consent to its

search.[9] In short, the interdiction team deprived defendant of his package as well as his right to control its course through the mail.

We thus conclude that the government significantly interfered with defendant's constitutionally protected possessory interest in the package, beginning with the initial removal of it from the stream of mail and continuing through their entire interaction with defendant. *See State v. Smith*, 327 Or 366, 376, 963 P2d 642 (1998) ("Padlocking the [defendant's storage] unit represented significant interference with respect to the unit [because, at] least in theory, it deprived defendant of the use of the unit and access to its contents."). It follows that the trial court correctly concluded, for purposes of Article I, section 9, that the interdiction team seized defendant's package when it removed it from the sorting bin and that seizure endured throughout the ensuing law enforcement investigation. *See id.* at 376 ("[P]roperty is 'seized' for the purposes of Article I, section 9, when the police significantly interfere with a person's *** possessory interests in the property.").

We briefly address the state's alternative argument that the interdiction team did not seize the package. According to the state, "defendant had at most a minimal possessory interest in the package during that period, with which the police did not meaningfully interfere *** because the police actions did not delay the package's timely delivery." There are several problems with that argument.

First, it is based on *LaFrance*, specifically, the same aspect of the First Circuit's contract-law-based reasoning that we have already considered and rejected above. Second, the Oregon Supreme Court rejected just such a "minimal intrusion" argument in *Smith*. In *Smith*, the state conceded that the police had "seized" a storage unit rented by the defendant when they padlocked it pending return of a

---

[9] Indeed, that appears to be the likely basis for the trial court's finding, noted above,

"that there was a seizure for sure at the time that the officer is on the telephone with the defendant and the officer is trying to get consent for a search, and the officer tells the defendant that if he denied consent then the officer would apply for a search warrant. At that point, the item has already—the package has already been seized."

search warrant. 327 Or at 376. The state argued, however, that padlocking the unit "involved such a minimal intrusion on defendant's rights that no warrant was required." *Id.* As the court explained,

> "[t]he reasoning offered for that distinction \* \* \* is that securing premises from the outside invades only *possessory* rights, which, relative to *privacy* rights, are of secondary importance in the constitutional scheme. *See, e.g., Segura v. United States*, 468 US 796, 806, 104 S Ct 3380, 3386, 82 L Ed 2d 599 (1984) (suggesting that invasions of possessory rights are less significant than invasions of privacy rights) \* \* \*."

*Id.*, (emphasis in original). The *Smith* court's succinct response to that reasoning applies with equal force here: "We do not agree with the state's suggestion that possessory rights deserve less protection than privacy rights[,] [w]hatever other jurisdictions may have said about the subject \* \* \*." *Id.* The court concluded that "Article I, section 9, speaks to both types of interests," and both merit the same procedural safeguards required by that constitutional provision. *Id.*

Even were we to apply the type of "minimal intrusion" analysis that the state offers, that kind of intrusion is typically only ultimately authorized, even in the jurisdictions that condone it, because law enforcement, through its *de minimis* investigative detention of the property, has acquired probable cause to obtain—and, in fact, *has obtained*—a warrant to justify further detention and subsequent search of the property. *See, e.g., LaFrance*, 879 F2d at 6 (citing *United States v. Veillette*, 778 F2d 899, 903 (1st Cir 1985), *cert den*, 476 US 1115 (1986) (discussing intrusiveness of interference with possessory interest in premises while proprietor was under arrest, but before warrant obtained)).

Finally, the facts here belie the state's argument that the interdiction team did not delay the package's timely delivery. The state offers two bases for that contention: one, that the interdiction team "delivered" the package to defendant's residence before noon, and, two, that the package

was never delayed because defendant consented to its seizure before the clock struck 12:00 p.m. The first contention is incorrect. As already noted, the police never surrendered control of the package after they seized it. Given that, it can hardly be said that they "delivered" it in any fashion. *See Webster's* at 597 (defining the verb, "deliver," in relevant part as, "GIVE, TRANSFER : yield possession or control of : * * * SURRENDER") (boldface in original). The second contention fails in light of our conclusion below that the interdiction team exploited their unreasonable seizure to gain defendant's consent. The two contentions are also at odds with each other. For, if the team "delivered" the package to defendant when they arrived with it on his doorstep, then defendant's possessory rights vested in the package at that moment, and the officers' continued exercise of dominion over the package violated those interests.

## B. *Exploitation*

We turn now to consider whether the interdiction team members impermissibly exploited[10] their unlawful seizure of the package to obtain defendant's consent to the searches of the package and his bedroom. When, as here, the defendant has established that an illegal seizure occurred and challenges the validity of his subsequent consent to a search, the state bears the burden of demonstrating that the consent was not the product of police exploitation of the illegal seizure. *Unger*, 356 Or at 74-75. The state argues that, assuming that the interdiction team unlawfully seized defendant's package, they did not exploit that seizure to obtain defendant's consents to search. We disagree.

"Oregon's constitutional protection against unreasonable searches and seizures includes the right to be free from the use, in a criminal prosecution, of evidence obtained in violation of defendant's rights under Article I, section 9."

---

[10] Courts have used different verbal formulations when referring to and discussing exploitation. *See Unger*, 356 Or at 80 (noting that different courts have framed the exploitation determination variously as "whether police 'exploited,' 'took advantage of,' or 'traded on' their unlawful conduct to obtain consent, or—examined from the perspective of the consent—whether the consent was 'tainted' because it was 'derived from' or was a 'product of' the unlawful conduct").

*State v. Jackson,* 268 Or App 139, 151, 342 P3d 119 (2014) (citing *Davis,* 313 Or at 249). Police conduct that runs afoul of Article I, section 9, requires suppression when "the police took advantage of information gained from their illegal conduct or some other aspect of that conduct to obtain consent— an advantage that they would not have had had the police stayed within the bounds of the law." *Unger,* 356 Or at 74; *see also State v. Williamson,* 307 Or 621, 626, 772 P2d 404 (1989) (search not valid when consent is "obtained under the pressure of police action that became available to police only by the prior unauthorized conduct").

When the state has obtained evidence following the violation of a defendant's Article I, section 9, rights, we presume that the evidence was tainted by the violation and must be suppressed. *Jackson,* 268 Or App at 151 (citing *Unger,* 356 Or at 84). The state may rebut that presumption by proving that "the consent was independent of, or only tenuously related to, the illegal police conduct." *Unger,* 356 Or at 84 (adhering to that requirement as stated in *State v. Hall,* 339 Or 7, 25, 35, 115 P3d 908 (2005)).

A causal connection requiring suppression *"may* exist" when "the police sought the defendant's consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct," or when "the unlawful police conduct * * * significantly affected the defendant's decision to consent." *Hall,* 339 Or at 35 (emphasis added); *accord Unger,* 356 Or at 86 (referring to the former causal connection as "direct" and the latter as "less direct exploitation"). "Deciding whether the state has satisfied that burden requires a fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection between the unlawful police conduct and the defendant's consent." *Hall,* 339 Or at 35. Whether, in the totality of the circumstances of a particular case, the police took advantage of their prior illegal conduct to obtain consent is a legal determination. *Unger,* 356 Or at 78. Relevant factors include the temporal proximity between the police misconduct and the consent; the existence of any intervening or mitigating circumstances; the nature of the police misconduct, including its purpose and flagrancy; and the voluntariness of the

consent.[11] *Jackson*, 268 Or App at 151 (citing *Unger*, 356 Or at 89-93).

The state concedes that a close temporal proximity existed between the illegal seizure and defendant's consent in the sense that the seizure of the package was ongoing when defendant consented to the searches. That concession is well-taken. *See State v. Kuschnick*, 269 Or App 198, 211, 344 P3d 480 (2015) (noting that the temporal proximity between the police illegality and the defendant's consent was close where the police requested and received the defendant's consent while the unlawful seizure was ongoing).

However, the state reasons, the overall tone of the knock-and-talk portion of the investigation was relatively unintimidating, particularly given that the conversation between Castaneda and defendant took place over the phone. The state also highlights that Castaneda repeatedly informed defendant that he was not under arrest and that he was free to refuse consent to the searches. We are not persuaded. We agree with the state that the conduct of the interdiction team at defendant's residence was not "flagrant." *See Unger*, 356 Or at 82 (describing as "[p]articularly flagrant conduct," "excessive use of force in unlawfully arresting a defendant, the unlawful forcible entry into a home by multiple officers wielding automatic weapons, or unlawful and lengthy in-custody interrogation"). We also acknowledge that Castaneda's statements to defendant that he was not under arrest and could withhold consent constitute mitigating circumstances. *See id.* at 80 (explaining that "circumstances that might mitigate the effect of the police

---

[11] As the Supreme Court explained in *Unger*,

"[t]he relationship between the voluntariness of consent and exploitation, of course, is a close one. * * * Yet it is important to emphasize that the tests are not identical and that they address separate concerns. As Professor LaFave notes,

"'While there is a sufficient overlap of the voluntariness and [exploitation] tests * * *, it is extremely important to understand that (i) the two tests are not identical, and (ii) consequently the evidence obtained by the purported consent should be held admissible only if it is determined that the consent was *both* voluntary and not an exploitation of the prior illegality.'"

*Unger*, 356 Or at 73 (quoting Wayne R. LaFave, 4 *Search and Seizure* § 8.2(d), 101 (5th ed 2012) (emphasis in treatise; second brackets in *Unger*; footnote omitted).

misconduct" include "the police advising the defendant of his right to refuse consent").

Nonetheless, the interdiction team's purpose in detaining the package weighs heavily against the state in the exploitation analysis. *See id.* at 87 (whether the police purpose underlying police misconduct was to gain the consent can be a factor in the exploitation analysis). As the interdiction team members themselves testified, their intention all along was to present the package to defendant in order to obtain his consent to search it—indeed, that is their customary practice—and so their purpose in doing so was to avoid obtaining a warrant and to exploit their possession of the package. *See id.* at 83 (stating that "objective circumstances may indicate the police purpose in engaging in conduct later determined to be unlawful[,] [and] [s]o, too, may statements that police make at the time or in a later court proceeding"). When the purpose of the police is to use contraband that they already possess as a result of their unlawful seizure, the police have "taken advantage of" or "exploited" their unlawful conduct to the defendant's detriment. *See id.* at 91 (stating that, when police unlawfully stop someone, for example, and then observe contraband and ask to search, the police exploit their misconduct). That tainted "purpose" suggests that the defendant's consent, even if voluntary, is also tainted. *See id.* (citing LaFave, 4 *Search and Seizure* § 8.2(d) at 111-12, 112 n 154) (stating that "a consent that follows a random stop or seizure that lacks probable cause or reasonable suspicion that a crime has been committed and that is nothing more than a fishing expedition for incriminating evidence" may be tainted).

Furthermore, the interdiction team's exploitation enabled them, in fact, to take steps toward obtaining defendant's consent that, without their possession of the package, would not have otherwise been available to them. Specifically, by presenting the package to defendant's housemates, the police learned from them that the package likely belonged to defendant, his identity, and his phone number. That information enabled them to target defendant, contact him, and, after he hesitated to grant consent, leverage their ongoing dominion over his package to obtain that consent. That use of the misconduct also weighs heavily against the

state and taints the voluntariness of defendant's consent. The Supreme Court has previously observed that "officers may request permission to inspect or search one's effects, and consent, particularly when granted after being informed of one's right to decline, as in this case, could be a voluntary waiver of a known right." *Williamson*, 307 Or at 626. However, the court in *Williamson* also concluded that, when an unlawful seizure causes a defendant "to weigh the consequences of consent against the alternative that the [defendant's property] would be detained indefinitely while the officers sought a search warrant," the government is "trading on evidence that they had only by virtue of the unlawful [seizure]" and the consent is consequently invalid. *Id*.

The state also argues that the only inculpatory knowledge that the police obtained from the seizure was the positive dog alert and that that alert was not the sole basis for seeking defendant's consent. Specifically, the state contends that the indicia on the package's exterior alone gave the interdiction team cause to bring the package to defendant's residence to seek his consent. According to the state, therefore, there was no exploitation because the police did not seek defendant's consent "solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct." *Hall*, 339 Or at 35.

That argument is unavailing. First, it is legally faulty to the extent that it misunderstands the import of *Hall* and *Unger*. Those cases merely stand for the proposition that police exploitation *"may"* exist when "the request for consent itself (and the evidence gathered) resulted from police knowledge of the presence of that evidence, which they had only because they had observed it during the illegal [seizure]." *Unger*, 356 Or at 86 (citing *Hall*, 339 Or at 35) (emphasis added). In other words, those cases speculate as to one set of facts that are possibly *sufficient* to establish exploitation; they do not hold, as the state would have us conclude, that such circumstances are *necessary* for exploitation to exist.

Second, in any case, the state's argument is factually incorrect as well. We have already concluded above that the interdiction team derived much more from its unlawful

seizure than just the dog-sniff results. And, again, as we have explained, even if the interdiction team's observations of the package's exterior indicia preceded their unlawful conduct, the team only obtained defendant's consent as a result of capitalizing on those observations by seizing the package and exploiting that seizure. The team's conduct in making those initial observations, then, cannot be disentangled from the subsequent unlawful conduct.

For the reasons stated above, we conclude that the government unlawfully seized the package without a warrant, under circumstances in which a warrant was required. We further conclude that the state failed to demonstrate that the subsequent consent search was "not the product of police exploitation" of the unlawful seizure. *Unger*, 356 Or at 75. Accordingly, the trial court did not err in granting defendant's motion to suppress.

Affirmed.